1  JUSTIN M. GOLDSTEIN  (SBN 198858)
   JAY S. HANDLIN  (SBN 196250)
2  CARLSMITH BALL LLP
   444 South Flower Street, 9th Floor
3  Los Angeles, CA 90071-2901
   Telephone:  213.955.1200
4  Facsimile:  213.623.0032
   Email:   jgoldstein@carlsmith.com
5            jhandlin@carlsmith.com

6  Attorneys for LAURA ARCHER DICK COELHO,
   AS TRUSTEE OF THE PHILIP K. DICK
7  TESTAMENTARY TRUST

8

9                  UNITED STATES DISTRICT COURT

10                CENTRAL DISTRICT OF CALIFORNIA

11  LAURA ARCHER DICK COELHO,        Case No. CV 11 - 8913 - ODW (JCGx)
    AS TRUSTEE OF THE PHILIP K.
12  DICK TESTAMENTARY TRUST,

13              Plaintiff,            COMPLAINT FOR DECLARATORY
                                     RELIEF REGARDING STATUS OF
                                     COPYRIGHT RIGHTS,
14        vs.                        DECLARATORY RELIEF
                                     REGARDING RIGHTS UNDER
15  MRC II DISTRIBUTION              CONTRACT, BREACH OF
    COMPANY, L.P., a Delaware limited CONTRACT, MONEY HAD AND
16  partnership; MRC II HOLDINGS     RECEIVED, QUANTUM MERUIT,
    L.P., a Delaware limited partnership; UNJUST ENRICHMENT, AND
17  OAKTREE ENTERTAINMENT,           ACCOUNTING
    INC., a Delaware corporation;
18  GEORGE NOLFI; and MICHAEL        [JURY TRIAL DEMANDED]
    HACKETT,
19
                Defendants.
20

21          COMPLAINT FOR DECLARATORY RELIEF

22     Plaintiff Laura Archer Dick Coelho, as Trustee of the Philip K. Dick

23  Testamentary Trust, alleges:

24                  PRELIMINARY STATEMENT

25     1.     This case is about defendants who wrongfully want something for

26  nothing.

27

28

2.      Defendants exploited the work of plaintiff Philip K. Dick Testamentary Trust (the "Trust") by making a film called *The Adjustment Bureau* that centered on shadowy figures who "adjust" lives and events when things don't go according to plan.  Now, motivated solely by greed, defendants seek to establish themselves as a de facto "Adjustment Bureau" of Hollywood.  Using heavy handed means, they seek to "adjust" agreements entered into long-ago agreed, "adjust" determinations made long ago by the U.S. Copyright Office, and even "adjust" history so as to hoard any and all monies rightfully earned by the estate of the man whose genius inspired what is indisputably a highly successful film.

3.      Philip K. Dick was the visionary author of science fiction novels and stories that have provided the basis for nearly a dozen feature films, including the classic *Blade Runner* and mega-hits like *Total Recall* and *Minority Report*.  Dick died in 1982, leaving a library of more than 200 written works that Hollywood continues to mine for box office gold.  The author's unique creative legacy is safeguarded by the Trust, which is overseen by Dick's children.

4.      In 2001, defendant George Nolfi was a writer without a major screen credit to his name; defendant Michael Hackett had yet to produce his first feature film; and Media Rights Capital and its subsidiaries and affiliates did not even exist.  That was the state of affairs when Hackett handed Nolfi the Philip K. Dick story "Adjustment Team" and suggested it might make a good movie.

5.      Nolfi approached the Trust, and negotiated a contract giving him the option to acquire exclusive movie rights to "Adjustment Team."  He was granted the option at a bargain rate.  In exchange, he committed to make substantial payments to the Trust if and when a movie was created.  As a condition to the deal going forward, Nolfi and his representatives expressly signed off that he had verified and approved the chain of title for "Adjustment Team."

6.      Years passed.  The Trust could have let the option expire.  Instead, it granted Nolfi one extension after another.  In return, he agreed to improve the

1   Trust's compensation.  If a motion picture ultimately resulted, the Trust would be
2   rewarded for its perseverance.

3         7.      As Nolfi and Hackett attempted to develop "Adjustment Team,"
4   several more major motion pictures based on Dick works were released, and the
5   name and reputation of Philip K. Dick grew in Hollywood.  Nolfi and Hackett
6   turned to the Trust, submitting draft after draft of the screenplay to receive creative
7   comments, thereby gaining the unique insights of Dick's heirs, who had long and
8   valuable experience in translating their father's visions to film.

9         8.      Finally, in 2009, Nolfi and Hackett succeeded in getting their
10  adaptation of "Adjustment Team" set up at Media Rights Capital ("MRC").  Nolfi
11  got to write and make his feature film directorial debut.  He and Hackett were both
12  producers of the film.  Matt Damon was hired to star.  Universal Pictures signed on
13  to distribute the picture.  With the Trust's assistance, "Adjustment Team" had
14  become *The Adjustment Bureau.*

15        9.      As with any studio-released project of this size—in such a high-risk
16  business and in such an uncertain economic climate—scores of attorneys, agents
17  and financiers were invariably involved along the way. It is inconceivable that each
18  and every detail of the project would not have been fully vetted before it was
19  greenlit and funds of the film's investors were put at risk.

20        10.     In marketing the movie, the defendants took every opportunity to
21  exploit the valuable imprimatur of the Trust's blessing and the Dick name.  As long
22  as defendants had a use for the Trust, they did everything they could to capitalize
23  on the fame, the cachet, the brand of being BASED UPON A STORY BY PHILIP
24  K. DICK.

25        11.     *The Adjustment Bureau* was released worldwide in early 2011.  By any
26  measure, it was a huge commercial success.  Although the movie reportedly only
27  cost $62 million to make, it took in over $128 million at the U.S. box office and
28  internationally—making it the third highest-grossing adaptation of a Philip K. Dick

1   work, behind only *Minority Report* and *Total Recall*. Even after the theatrical

2   release was over, the revenues kept coming; aided by another round of publicity

3   provided by Mr. Dick's heirs, starting in June 2011, the movie sold $10 million in

4   DVDs in the United States alone, and unknown millions more overseas.

5       12.   Now is the time when the defendants are supposed to honor their

6   contractual obligations and pay the Trust the rest of what it is owed for its rights, its

7   patience, its labors. But, having squeezed what they needed from the Trust, now

8   the defendants seek to renege.

9       13.   Only after the motion picture had been in theaters for a month did the

10   defendants claim they "discovered" an issue in the copyright chain of title for

11   "Adjustment Team." They contend the copyright is invalid, and that "Adjustment

12   Team" was, at all relevant times, in the public domain. Under this absurd new

13   theory in which they seek to act as a de facto "Adjustment Bureau," defendants

14   argue they never needed the Trust. So brazen are defendants, they claim that they

15   could have made and released the movie worldwide without having to pay *anything*

16   for the rights to the underlying Dick work, without having to pay *anything* for the

17   rights to use and leverage the Philip K. Dick name and goodwill, and without

18   having to pay *anything* for the benefits of the contributions from the Dick heirs.

19   So, despite having gotten *their* benefits of the bargain, defendants seek to deprive

20   the Trust of *its* side of the deal.

21       14.   Thus, this Court is called upon to determine the validity of the Trust's

22   copyright in "Adjustment Team." A judicial declaration that the copyright is alive

23   and well defeats all of defendants' arguments against paying. A multitude of facts

24   confirms the copyright's health.

25       15.   First, Nolfi—and, by succession, the MRC defendants—and each of

26   their representatives approved the chain of title back in 2001; they cannot challenge

27   it now. Second, given the major players involved and the money at stake, it is

28   simply not credible that defendants never performed their own copyright due

1   diligence, but instead *coincidentally* only found the supposed issue after they no

2   longer needed the Trust.  Third, the "publication" on which their theory is based

3   was unauthorized, meaning it had no impact on the copyright status of "Adjustment

4   Team."  Fourth, the validity of the Trust's copyright is confirmed by the U.S.

5   Copyright Office's grant of a registration and a renewal, which are entitled to a

6   legal presumption of correctness.  And fifth, even if the work were in the U.S.

7   public domain, it remains copyrighted internationally—meaning the defendants'

8   globally released movie required the rights granted by the Trust in any event.

9       16.   Defendants also got their money's worth, with or without copyright.

10  They benefited enormously from the commercial value of the Philip K. Dick name

11  and brand.  They received the Trust's creative and promotional labors, and in fact

12  worked with Universal to encourage publicity involving the heirs.  Defendants'

13  unwillingness to pay for any of these benefits, which they requested and enjoyed to

14  their considerable financial betterment, is a cynical and unwarranted grab for more

15  money, plain and simple.

16      17.   The Trust did not seek out this fight.  It has always zealously guarded

17  the legacy of Philip K. Dick—but, until today, nearly three decades after the

18  author's passing, it has never had to file a lawsuit.  Some things, however, are worth

19  fighting for.  The vindication of Mr. Dick's rights, and those of his heirs, are worth

20  fighting for.

21      18.   Throughout his vast body of work, Philip K. Dick returned again and

22  again to the challenges of differentiating between reality and illusion.  Here, let

23  there be no mistake:  like Mr. Dick's enduring talent, the Trust's rights, and its

24  entitlement to just compensation, are real.  The defendants' positions are poor

25  fiction, which should be rejected and forgotten.

26              **THE PARTIES**

27      19.   Plaintiff, the Philip K. Dick Testamentary Trust (the "Trust"), by and

28  through its Trustee, Laura Archer Dick Coelho, is a testamentary trust formed to

1    maintain, promote, and develop the creative works of renowned science fiction
2    author Philip K. Dick.
3        20.    The Trust is informed and believes, and on that basis alleges, that
4    Defendant MRC II Distribution Company, L.P. ("MRC Distribution") is a
5    Delaware limited partnership with its principal place of business in Los Angeles
6    County, California.  The Trust is further informed and believes, and on that basis
7    alleges, that MRC Distribution at all times relevant hereto has engaged in business
8    within the State of California, both on a regular basis and specifically in connection
9    with the transactions and events alleged in this Complaint.
10       21.    The Trust is informed and believes, and on that basis alleges, that
11   Defendant MRC II Holdings L.P. ("MRC Holdings") is a Delaware limited
12   partnership with its principal place of business in Los Angeles County, California.
13   The Trust is further informed and believes, and on that basis alleges, that MRC
14   Holdings at all times relevant hereto has engaged in business within the State of
15   California, both on a regular basis and specifically in connection with the
16   transactions and events alleged in this Complaint.
17       22.    The Trust is informed and believes, and on that basis alleges, that
18   Defendant Oaktree Entertainment, Inc. ("Oaktree") is a Delaware corporation with
19   its principal place of business in Los Angeles County, California.  The Trust is
20   further informed and believes, and on that basis alleges, that Oaktree at all times
21   relevant hereto has engaged in business within the State of California, both on a
22   regular basis and specifically in connection with the transactions and events alleged
23   in this Complaint.
24       23.    The Trust is informed and believes, and on that basis alleges, that
25   Defendant George Nolfi ("Nolfi") is a resident of the State of New York who works
26   as a screenwriter and director of feature motion pictures.  The Trust is further
27   informed and believes, and on that basis alleges, that Nolfi at all times relevant
28   hereto has engaged in business within the State of California, both on a regular

1  basis and specifically in connection with the transactions and events alleged in this

2  Complaint.

3      24.    The Trust is informed and believes, and on that basis alleges, that

4  Defendant Michael Hackett ("Hackett") is a resident of the State of California who

5  works as a producer of feature motion pictures, and who was the producing partner

6  of Defendant Nolfi in connection with the transactions and events alleged in this

7  Complaint.  The Trust is further informed and believes, and on that basis alleges,

8  that Hackett at all times relevant hereto was a resident of and has engaged in

9  business within the State of California, both on a regular basis and specifically in

10  connection with the transactions and events alleged in this Complaint.

11     25.    The Trust is informed and believes, and on that basis alleges, that

12  MRC Distribution and MRC Holdings are both owned, in whole or in part, by a

13  common entity, MRC II Sub GP, LLC (which is not a party hereto); that at all times

14  material hereto, there existed a unity of interests and ownership among MRC

15  Distribution, MRC Holdings, and Oaktree (collectively, the "MRC Defendants")

16  such that any individuality between them either ceased to exist or never existed in

17  the first instance; that the MRC Defendants are controlled, dominated, managed and

18  operated in such a manner that there is no separateness between them; and that they

19  are the alter egos of each other.

20                        **JURISDICTION AND VENUE**

21     26.    This Court has subject matter jurisdiction over this action pursuant to

22  28 U.S.C. § 1331, on the grounds that the Complaint asserts claims arising under

23  the United States Copyright Act, 17 U.S.C. § 101, *et seq.*

24     27.    The Trust is informed and believes, and on that basis alleges, that this

25  Court has personal jurisdiction over the MRC Defendants because at all times

26  relevant hereto each of them has regularly engaged in business in the State of

27  California; and specifically, by entering into, acquiring rights to, or assigning rights

28  to one or more of the agreements alleged herein with individuals and/or entities

1  residing in California, which agreement(s) specify California law as the applicable

2  law and California as the venue for resolution of disputes.  The MRC Defendants

3  have purposely availed themselves of the rights and privileges of conducting

4  business in the State of California.

5       28.    The Trust is informed and believes, and on that basis alleges, that this

6  Court has personal jurisdiction over Nolfi because Nolfi at all times relevant hereto

7  has regularly engaged in business in the State of California; and specifically, by

8  negotiating and entering into the agreement alleged herein with individuals and/or

9  entities residing in California, which specifies California law as the applicable law

10  and California as the venue for resolution of disputes.

11       29.    The Trust is informed and believes, and on that basis alleges, that this

12  Court has personal jurisdiction over Hackett because Hackett at all times relevant

13  hereto was a resident of and has regularly engaged in business in the State of

14  California.

15       30.    Venue is proper in the Central District of California pursuant to 28

16  U.S.C. § 1391(b) on the grounds that (i) the MRC Defendants are "residents" of the

17  State of California, as the term "resident" is defined in 28 U.S.C. § 1391(c); (ii)

18  Nolfi engaged in business and entered into contracts at issue in this matter in the

19  State of California; (iii) Hackett is a resident of the State of California and engaged

20  in business at issue in this matter in the State of California; and (iii) a substantial

21  part of the events giving rise to the Trust's claims occurred in this judicial district.

22  ## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

23  **A.**   **The Life, Work, and Legacy of Philip K. Dick**

24       31.    The plaintiff in this matter, the Trust, has brought this lawsuit to

25  vindicate the rights and the genius of legendary science fiction author Philip K.

26  Dick.

27       32.    Philip K. Dick lived a tragically short life.  But in his 53 years, he

28  created an unprecedented body of work, authoring 45 published novels, 125 short

1  stories, and 30 essays.  Like many great artists, Mr. Dick's brilliance and influence

2  were under-appreciated and under-compensated during his life.  He wrote at a feve

3  pitch, laboring day and night, yet often was paid pennies per word.  Traditional

4  publishers and editors resisted his works, with their troubling themes—questioning

5  what is real, and what it means to be human—viewed as too challenging and too

6  philosophical for mainstream audiences.

7       33.    Again, like many great artists, Philip K. Dick's talent was only fully

8  appreciated after his death.  Dick died on March 2, 1982.  Less than three months

9  later, on June 25, 1982, the motion picture *Blade Runner*—director Ridley Scott's

10  iconic adaptation of Dick's dystopian novel "Do Androids Dream of Electric

11  Sheep?"—was released.  Since then, no fewer than 10 additional motion pictures

12  have been based on Dick's works, including *Total Recall* (1990), *Minority Report*

13  (2002), and the movie at the core of the present dispute, *The Adjustment Bureau*,

14  which was released theatrically in the United States and around the world in

15  February-March 2011, and was released on DVD in June 2011.

16       34.    As the defendants in this case have known and eagerly exploited,

17  "Philip K. Dick" is a Hollywood and global brand that carries cachet and attracts

18  audiences.  It is estimated that motion pictures and other entertainment projects

19  based on Dick's works have grossed more than a billion dollars worldwide.

20       35.    Like the Defendants here, other motion picture studios, directors, and

21  writers continue to see the enduring and substantial value, both creative and

22  financial, in the visionary works of Philip K. Dick.  The late author's works,

23  administered by the Trust, continue to be prized as source material for motion

24  picture and television projects.  Indeed, MRC has announced that it is producing a

25  TV series based on *The Adjustment Bureau*, for potential release as early as 2012—

26  and has prominently told the world that the series is based on Philip K. Dick's short

27  story "Adjustment Team."

28

**B.**   **The Agreement with Defendant Nolfi**

36.   Upon information and belief, in 2001, after Michael Hackett brought the Philip K. Dick short story "Adjustment Team" to his attention and suggested it as source material for a motion picture, George Nolfi approached the Trust seeking the rights to develop "Adjustment Team" as a feature film.  By agreement dated as of May 23, 2001, the Trust granted to Nolfi the exclusive right to purchase the motion picture rights to "Adjustment Team," which, upon information and belief, was written by Dick in 1953 (the "Agreement").

37.   Under the Agreement, Nolfi committed to numerous payment obligations:

(a)   Nolfi paid $25,000 for a one-year initial option to purchase the motion picture rights, and agreed to two additional one-year option extensions in exchange for his payment of $25,000 for each extension.  (Section 1(a)-(c).)

(b)   Nolfi agreed to pay a "Set-Up Bonus" if he succeeded in entering into an agreement with a studio to develop and/or produce a movie based on "Adjustment Team."  (Section 1(d).)

(c)   If Nolfi decided to exercise the option and buy the motion picture rights, the Agreement obligated him to pay a purchase price that varied based upon the approved budget for the movie:  for a movie budgeted at less than $50 million, the purchase price was $1,000,000; for a budget between $50 million and $75 million, the purchase price was $1,500,000; and for a budget over $75 million, the purchase price was $1,850,000.  (Section 2(a).)

(d)   If a motion picture based on "Adjustment Team" achieved "Breakeven," *i.e.*, when its worldwide gross receipts minus certain deductions equals twice the cost of production plus overhead, interest, and the cost of prints and advertising, Nolfi was obligated to pay an additional $100,000.  (Section 2(b)(i).)

1      (e)    Nolfi was obligated to pay the Trust a further $100,000 for each

2  additional $10 million in worldwide gross receipts in excess of Breakeven up to the

3  point the Trust received a total of $2 million in payments.  (Section 2(b)(ii).)

4      (f)    Nolfi agreed to pay the Trust 2-1/2 percent of the "net profits" derived

5  from exploitation of a motion picture based on "Adjustment Team."  (Section 2(c).)

6      38.    In Section 3 of the Agreement, the Trust made a variety of

7  representations and warranties, including that it was the sole owner of the rights

8  granted, and that "Adjustment Team" was not in the public domain.

9      39.    On its very first page, the Agreement expressly stated that it was

10  contingent upon Nolfi's approval, in his sole discretion, of the chain of title to

11  "Adjustment Team."  In other words, not only did Nolfi have a contractual right to

12  verify the chain of title for the work, but the contract literally could not go forward

13  until after Nolfi had affirmatively satisfied himself about the chain of title to

14  "Adjustment Team" and approved it.  The fact that the Agreement was signed, the

15  deal went forward, the option was ultimately exercised, and *The Adjustment Bureau*

16  was made all establish that, in 2001, Nolfi approved the chain of title to

17  "Adjustment Team."  For that reason, among others, Nolfi and the other Defendants

18  could not have actually or reasonably relied on the Trust's representations and

19  warranties regarding copyright ownership or status.

20      40.    By its terms, the original Agreement would have expired after three

21  years, *i.e.*, on May 23, 2004.  Because of his ongoing strong interest in "Adjustment

22  Team," however, Nolfi continued to request and negotiate amendments to the

23  Agreement which gave him further extensions of the option.  Nolfi and the Trust

24  entered into three letter agreements amending the Agreement, dated as of

25  November 10, 2004, January 25, 2007, and April 25, 2008.  (Unless otherwise

26  specified, references to the Agreement hereafter shall refer to the Agreement, as

27  amended.)  Each time, the Trust extended Nolfi's option period.

28

1    41.    In return for those further extensions, the financial terms were also

2  amended in favor of the Trust.  Among other things, the letter agreement dated as

3  January 25, 2007 (the "2007 Amendment") obligates Nolfi to make an "Additional

4  Deferment" payment to the Trust, and improves the terms of the Trust's

5  participation rights.

6  **C.    Nolfi Sets Up the Picture with MRC**

7    42.    In early 2009, representative of the Trust learned from reading the

8  Hollywood trade papers that Nolfi had succeeded in setting up a motion picture

9  based on "Adjustment Team" with MRC, and subsequently learned that Nolfi's

10  deal with MRC was arranged by Michael Hackett, Nolfi's producing partner.

11    43.    On June 19, 2009, MRC notified the Trust that by agreement dated

12  April 20, 2009, Nolfi had assigned all of his rights in the Agreement to Oaktree, a

13  production subsidiary of MRC.  MRC further advised that Oaktree was exercising

14  the option and purchasing the motion picture rights, and had wired payment of

15  $1,400,000 to the Trust.

16    44.    According to MRC Distribution, through a series of written

17  assignments, Oaktree subsequently transferred its rights in the Agreement to MRC

18  Distribution.  Upon information and belief, Oaktree transferred its rights in the

19  Agreement to MRC Holdings, which in turn transferred those rights to MRC

20  Distribution.  The Trust has never received a copy of the agreement between Nolfi

21  and Oaktree, nor any of the assignments.

22    45.    Upon information and belief, some or all of the MRC Defendants have

23  succeeded to some or all of Nolfi's rights and obligations under the Agreement.

24  Whether and to what extent Nolfi's obligations under the Agreement have been

25  assigned or otherwise transferred to others Defendants is information that is solely

26  in the knowledge and possession of Defendants.

27    46.    All of the Defendants who succeeded to any of the rights under the

28  Agreement also succeeded to Nolfi's acknowledgment therein that he had had the

1   opportunity to examine and verify, and had affirmatively approved, the chain of

2   title for "Adjustment Team."

3   **D.**   **Defendants' Breaches of the Financial Obligations Under the Agreement**

4       47.   Pursuant to paragraph 7 of the 2007 Amendment, Nolfi's—now the

5   MRC Defendants'—obligation to start making the most significant Deferment

6   payment of $500,000 is triggered once "Initial Actual Breakeven" is achieved,

7   which is defined as "the point when 'net profits' (as defined in Paragraph 2(c) of

8   the Agreement) are first available for distribution, provided that there shall be no

9   distribution fee charged." According to Paragraph 2(c) of the Agreement, "net

10   profits" are to be defined consistently with the standard net profits definition of "the

11   production, financing and/or distribution entity," subject to good faith negotiation

12   within the customary parameters of "the production, financing and/or distribution

13   entity." The MRC Defendants were thus contractually obligated to engage in

14   discussions with the Trust regarding net profit definitions. Relying on their

15   pretextual arguments about "Adjustment Team"'s copyright status, however, the

16   MRC Defendants have taken the position that they owe no obligations at all to the

17   Trust under the Agreement. Therefore, the Defendants have not even provided the

18   Trust with standard net profit definition forms, much less engaged in good faith

19   negotiations. Unless and until Defendants do so, they cannot comply with their

20   substantial ongoing payment obligations to the Trust.

21       48.   Although the foregoing is the most significant Deferment payment, it

22   is not the only one. Paragraph 2(b)(i) and (ii) of the Agreement describes other

23   Deferment payments in $100,000 installments, which begin to be triggered once the

24   Picture reaches "Breakeven," as defined in Paragraph 2(b)(i). Moreover,

25   Defendants owe participation obligations to the Trust, as provided in Paragraph 7 of

26   the 2007 Amendment and Paragraph 2(c) of the Agreement.

27       49.   Notwithstanding the roughly $128 million in reported worldwide

28   receipts generated by *The Adjustment Bureau* from box office, a reported $10

1  million in domestic DVD sales, and unknown millions more in international DVD

2  sales, Defendants have not even issued a single accounting statement to the Trust

3  indicating whether any of the thresholds for the Deferment payments or

4  participation payments have been reached, much less made any payments.

5    50. Upon information and belief, Defendants' failure to issue any

6  accounting statements to the Trust is unrelated to whether those financial thresholds

7  have been reached; rather, the withholding of any and all financial reporting is

8  based on Defendants' pretextual position that they owe the Trust no obligation

9  whatsoever under the Agreement.  Defendants have also affirmatively repudiated

10  any obligation under the Agreement on a going forward basis, and demanded the

11  return of prior payments.  The failure to issue such statements, the failure to make

12  required payments and demand the return of payments, the failure to negotiate in

13  good faith regarding an appropriate net profits definition, and the repudiation of all

14  going-forward obligations, are all among the Defendants' breaches of their

15  obligations under the Agreement.

16  **E.** **The Publication and Registration History of "Adjustment Team"**

17    51. In a transparent effort to evade their clear and substantial ongoing

18  payment obligations to the Trust under the Agreement, Defendants have taken the

19  unfounded position that they owe the Trust nothing because of purported issues

20  with the copyright status of "Adjustment Team."  But the publication and

21  registration history of "Adjustment Team" shows that it remains protected by

22  copyright, in the United States and throughout the world.

23    52. The Trust is informed and believes, and on that basis alleges, that

24  Philip K. Dick wrote "Adjustment Team" in 1953.

25    53. The Trust is informed and believes, and on that basis alleges, that the

26  story first appeared in issue # 4 of *Orbit Science Fiction* ("*Orbit*"), the September-

27  October 1954 edition, which hit newsstands on July 29, 1954.  *Orbit* was a short-

28  lived, fly-by-night publication that was managed through pseudonyms and which

1   lasted only five issues.  The contents of *Orbit* issue # 4 were registered with the

2   U.S. Copyright Office under Registration No. B00000486659 in the name of

3   *Orbit*'s owner, Hanro Corporation.  No renewal of that registration has been found

4       54.    The Trust is informed and believes, and on that basis alleges, that

5   Philip K. Dick did not authorize the publication of "Adjustment Team" in *Orbit*—a

6   third-rate pulp—and, in fact, did not even learn of the publication until after it

7   occurred.  It has been reported that *Orbit* and another similar publication were

8   "phonied up" by Dick's literary agent, Scott Meredith—with Donald Wollheim, an

9   editor and publisher of science fiction, having some apparent involvement—to

10  generate bogus, bargain-price "sales" of works by Meredith's clients that he had

11  failed to sell legitimately.  The Trust is informed and believes, and on that basis

12  alleges, that all this information was concealed from Dick; the author did not know

13  about these sham "sales," but, had he known the truth about *Orbit*, under any

14  circumstances he would not have knowingly allowed them to occur.

15      55.    The Trust has been able to locate no contemporaneous records

16  reflecting communication from Scott Meredith advising Dick of the publication of

17  "Adjustment Team" in *Orbit*, although the agent typically did convey news of story

18  sales to the author in writing.  Dick's records from 1954 show no contemporaneous

19  payment for the story.  Despite being a dedicated correspondent whose letters

20  provided friends with minute details of his publishing highs and lows, Dick's letters

21  from the period make no mention at all of a sale of "Adjustment Team" to *Orbit*, or

22  of its publication therein.  And, when interviewed late in his life, Dick stated that he

23  had no contact with Donald Wollheim (the editor who apparently acquired

24  "Adjustment Team" for *Orbit*) until his agent sent Wollheim the manuscript for

25  Dick's novel "Solar Lottery" in 1954—evidencing that Dick was not aware of

26  *Orbit*'s purchase of "Adjustment Team."  All the objective indicia point to the same

27  conclusion:  Dick didn't even know "Adjustment Team" was sold to *Orbit*, much

28  less approve the sale before it occurred.

56.   Because Dick did not know of or consent to the publication of "Adjustment Team" in *Orbit*, for purposes of copyright law, the story's appearance in that magazine did not constitute "publication" at all. Made without authorization, the *Orbit* appearance did not trigger any requirement on Dick's part to register the copyright in his story, and likewise did not trigger any need to renew a 1954 registration.

57.   The first *authorized* publication of "Adjustment Team"—and, therefore, the first publication requiring copyright notice and registration—occurred in 1973, in a collection of the author's stories entitled "The Book of Philip K. Dick." That volume bore the notice "Copyright 1973 by Philip K. Dick." The book, including "Adjustment Team," was duly registered with the U.S. Copyright Office in the name of Philip K. Dick on February 9, 1973. It was assigned registration number A490535. Although no renewal was then required, a valid renewal registration was made for the book, and each of the stories it contained, on January 2, 2002. The renewal registration was made in the names of Laura Coelho, Christopher Dick, and Isolde Hackett—the deceased author's children—and received registration number RE-861-409. The renewal registration was assigned to the Trust and recorded with the U.S. Copyright Office on April 29, 2009.

58.   The renewal registration remains valid and in effect, and "Adjustment Team" retains its U.S. Copyright thereunder. It is not in the public domain, in the United States or anywhere else.

59.   Even if the printing of "Adjustment Team" in *Orbit* in 1954 had constituted "publication" under the copyright laws, that appearance would have resulted in the work being protected, from 1954 and to the present day, in a host of countries internationally. The Table of Contents page of *Orbit* issue # 4 quotes different subscription rates for the U.S. ($2.00), Canada ($2.50), and "foreign" ($3.00), indicating that the magazine (including "Adjustment Team") was simultaneously published internationally. Under the Berne Convention, such

1  simultaneous international publication entitles "Adjustment Team" to copyright

2  protection in certain Berne signatory countries for a minimum term of the author's

3  life plus fifty years, *i.e.*, until at least 2032.

4      60.    For those reasons, among others, even if "Adjustment Team" were in

5  the U.S. public domain (which it is not), it is unquestionably protected by copyright

6  in countries around the world.  Anyone wanting to make a major motion picture

7  based on "Adjustment Team" and to release it in theaters worldwide—in other

8  words, anyone wanting to do what Defendants did—would require a grant of the

9  movie rights from the Trust.

10  **F.      The Additional Benefits Conferred Upon Defendants by the Trust**

11      61.    By entering into the Agreement with the Trust, Defendants obtained

12  far more than just a grant of motion picture rights in "Adjustment Team."

13      62.    Defendants obtained the assistance and creative participation of Isa

14  Dick Hackett, Laura Archer Dick Coelho, and the staff of Electric Shepherd

15  Productions, LLC ("Electric Shepherd"), the company established by Mr. Dick's

16  heirs that is dedicated to stewardship and adaptation into entertainment product of

17  their father's library of works.  Ms. Hackett and Electric Shepherd have extensive

18  experience in helping translate Mr. Dick's unique creative literary visions to film.

19  Among other contributions, Ms. Hackett and the staff of Electric Shepherd read and

20  gave input on the many iterations of the script for *The Adjustment Bureau*, and

21  ultimately Ms. Hackett received Executive Producer credit and Electric Shepherd

22  also received credit on the film.

23      63.    Defendants further received substantial marketing support from the

24  Trust and the Dick heirs for their motion picture.  In particular, Defendants

25  benefited by having Ms. Hackett, at the request of distributor Universal, perform a

26  series of publicized interviews in connection with the theatrical and DVD release of

27  *The Adjustment Bureau*.

28

64.     By entering into (and/or succeeding to) the Agreement and obtaining the imprimatur of the Trust, Defendants also were able to exploit the very substantial goodwill associated with the name "Philip K. Dick."  By advertising, marketing, and promoting their movie's theatrical and DVD releases with the "BASED UPON A STORY BY PHILIP K. DICK" banner, Defendants immediately connected themselves in the minds of the movie-going public with famous and successful works like *Blade Runner*, *Total Recall*, and *Minority Report*. They promoted their association with the valuable Philip K. Dick brand in advertising, on the film's prints, and on the DVDs.  Under applicable right of publicity laws, Defendants would have been prohibited from making those uses of the Dick name, image, and persona had they not paid the Trust for, and been granted, the rights to do so.

65.     The MRC Defendants continue to exploit the valuable Philip K. Dick name and brand.  They do so on the MRC web site, and on posters and all other promotional material for *The Adjustment Bureau*.  In addition, when it announced its television series, MRC emphasized that the series would be based on a Philip K. Dick work.

66.     Defendants have profited enormously from these benefits, none of which has anything to do with copyright.  Under any circumstance—with "Adjustment Team" fully protected by copyright worldwide, or protected internationally, or not protected at all—Defendants still received the full value they have paid under the Agreement.  And, as they continue to exploit *The Adjustment Bureau* and derivative works based on it, Defendants continue to receive and profit from these significant benefits.

67.     Nor have Defendants been damaged in any respect.  Even if their pretextual copyright theory were entirely correct, no one has seized on the purported public domain status of "Adjustment Team" and made a competing motion picture that cannibalized the market for *The Adjustment Bureau*.  And

1   Defendants' claim that they might have had to pay less had they known about the

2   purported copyright status issue is rank speculation.

3   **G.   Nolfi's Apparent Concealment of the Copyright "Issue" from MRC**

4       68.   On January 7, 2010, through their respective counsel, Nolfi contacted

5   the Trust and inquired whether the U.S. copyright for "Adjustment Team" might be

6   in the public domain.  Five days later, on January 12, 2010, the Wikipedia entry for

7   "Adjustment Team" was modified by an anonymous user to state that "Adjustment

8   Team" is in the public domain in the United States based upon the 1954 publication

9   in *Orbit*.

10      69.   This issue was unknown to the Trust at the time it entered into the

11  Agreement.  In March 2010, the Trust explained to Nolfi that the "public domain"

12  issue was unfounded because, as described above, the 1954 publication was

13  unauthorized.

14      70.   According to the MRC Defendants, despite knowing about this

15  claimed issue since at least January 2010, and despite having received the Trust's

16  explanation in March 2010, Nolfi and his producing partner, Michael Hackett, sat

17  on the issue and concealed it from the MRC Defendants for more than a year.  And

18  in the meantime, Defendants requested and knowingly accepted benefits from the

19  relationship with the Trust created by the Agreement, including but not limited to:

20  receiving creative assistance from representatives of the Trust; using representatives

21  of the Trust to promote the release of the film theatrically and on home video; and

22  using the "Philip K. Dick" name, brand, and associated goodwill in promoting the

23  film theatrically, on home video, and for further derivative projects.  Only after

24  receiving these and other benefits from the Trust under the Agreement have

25  Defendants taken the position that the Trust is entitled to nothing.

26      71.   For the reasons set forth herein, Defendants have no legitimate

27  concerns or basis for complaint.  But to the extent the MRC Defendants contend

28  otherwise, their claims should be directed to Defendants Nolfi and Hackett, who

1   apparently did not tell the MRC Defendants what they knew, and who, in any

2   event, expressly approved chain of title for "Adjustment Team" at the outset.

3   ### FIRST CLAIM FOR RELIEF

4   #### (Declaratory Relief Regarding Status of Copyright Rights –

5   #### Against MRC Defendants and Nolfi)

6   72.   The Trust realleges and reincorporates all preceding allegations in this

7   Complaint.

8   73.   There exists an actual and present controversy between the Trust, on

9   the one hand, and Nolfi and the MRC Defendants, on the other hand, as to whether

10  "Adjustment Team" existed in the public domain in the United States and other

11  international territories at the time that the Trust and Nolfi (now effectively the

12  MRC Defendants, based on the reported assignment) entered into the Agreement

13  (and thereafter).  The Trust claims that at the time the Agreement was made,

14  "Adjustment Team" was not (and at all times thereafter has not been) in the public

15  domain in the United States or any other international territories.  The Trust is

16  informed and believes, and on that basis alleges, that Nolfi and the MRC

17  Defendants dispute this claim.

18  74.   Accordingly, the Trust is entitled to a judicial declaration that at the

19  time of the Agreement "Adjustment Team" was not (and at all times thereafter has

20  not been) in the public domain in the United States or any other international

21  territories.

22  ### SECOND CLAIM FOR RELIEF

23  #### (Declaratory Relief Regarding Rights Under Contract –

24  #### Against MRC Defendants and Nolfi)

25  75.   The Trust realleges and reincorporates all preceding allegations in the

26  Complaint.

27  76.   There exists an actual and present controversy between the Trust, on

28  the one hand, and Nolfi and the MRC Defendants, on the other hand, as to whether

1   the Trust is entitled to receive full performance by Nolfi (now effectively the MRC
2   Defendants, based on the reported assignment) of the obligations set forth in the
3   Agreement.  The Trust claims that it has fulfilled all of its obligations under the
4   Agreement—including that its representations and warranties in the Agreement
5   relating to the copyright in "Adjustment Team" were accurate—and that it is
6   entitled to complete performance of Nolfi (now effectively the MRC Defendants,
7   based on the reported assignment) of his/their obligations set forth in the
8   Agreement.  The Trust further claims that the representations and warranties in the
9   Agreement relating to the copyright in "Adjustment Team" were not material to the
10  Agreement for all of the reasons described in the foregoing paragraphs (including,
11  without limitation, because:  Nolfi [now effectively the MRC Defendants, based on
12  the reported assignment] satisfied himself/themselves about the chain of title to
13  "Adjustment Team" and approved it; Nolfi and the other Defendants could not have
14  actually or reasonably relied on the Trust's representations and warranties regarding
15  copyright ownership or status; all of the other consideration Defendants received
16  based on the Agreement; and Defendants would have suffered absolutely no
17  damage even if the representations and warranties were inaccurate).  In addition,
18  the Trust claims that even if the Court were to determine that at the time the
19  Agreement was made (or at any or all times thereafter) the "Adjustment Team" was
20  in the public domain in the United States or any other international territories,
21  and/or that the Trust's representations and warranties in the Agreement relating to
22  the copyright in "Adjustment Team" were not accurate, and/or that the Trust did not
23  fulfill some other of its obligations under the Agreement, the Trust would still be
24  entitled to receive full performance by Nolfi (now effectively the MRC Defendants,
25  based on the reported assignment) of his/their obligations set forth in the
26  Agreement for all of the reasons described in the foregoing paragraphs (including,
27  without limitation:  Defendants received the benefit of being able to distribute the
28  motion picture in international territories where copyright protection for the Trust

1  would have still existed even if "Adjustment Team" had been in the public domain

2  in the United States; Defendants requested and received the benefit of creative

3  assistance from representatives of the Trust; Defendants requested and received the

4  benefit of help from representatives of the Trust to promote the release of the film

5  theatrically and on home video; and Defendants requested and received the benefit

6  of permission to use the "Philip K. Dick" name, brand, and associated goodwill in

7  promoting the film theatrically, on home video, and for further derivative projects).

8  The Trust is informed and believes, and on that basis alleges, that the MRC

9  Defendants and Nolfi dispute each of these claims.

10      77.      Accordingly, the Trust is entitled to a judicial declaration that:

11      (a)      The Trust has fulfilled all of its obligations under the Agreement—

12  including that its representations and warranties in the Agreement relating to the

13  copyright in "Adjustment Team" were accurate—and it is entitled to complete

14  performance of Nolfi (now effectively the MRC Defendants, based on the reported

15  assignment) of his/their obligations set forth in the Agreement;

16      (b)      The Trust's representations and warranties in the Agreement relating

17  to the copyright in "Adjustment Team" were not material; and

18      (c)      Even if at the time the Agreement was made (or at any or all times

19  thereafter) "Adjustment Team" was in the public domain in the United States or any

20  other international territories, and/or the Trust's representations and warranties in

21  the Agreement relating to the copyright in "Adjustment Team" were not accurate,

22  and/or the Trust did not fulfill some other of its obligations under the Agreement,

23  the Trust would still be entitled to receive full performance by Nolfi (now

24  effectively the MRC Defendants, based on the reported assignment) of his/their

25  obligations set forth in the Agreement.

26

27

28

### THIRD CLAIM FOR RELIEF

#### (Breach of Contract –

#### Against MRC Defendants and Nolfi)

78.    The Trust realleges and reincorporates all preceding allegations in the Complaint.

79.    The Trust and Nolfi (now effectively the MRC Defendants, based on the reported assignment) entered into the Agreement on or about May 23, 2001. The Agreement was subsequently amended (by letter agreements dated as of November 10, 2004, January 25, 2007, and April 25, 2008).

80.    The Trust has performed all conditions, covenants, and promises required of it by the Agreement.

81.    Starting in March 2011, Nolfi and the MRC Defendants breached the Agreement in all of the ways described in the foregoing paragraphs, including by failing to issue any accounting statements to the Trust, failing to make required payments and demanding the return of prior payments, failing to negotiate in good faith regarding an appropriate net profits definition, and repudiating any obligation to the Trust under the Agreement on a going forward basis.

82.    As a direct and proximate result of the breaches of the Agreement by Nolfi and the MRC Defendants, the Trust has been damaged in an amount that is no less than the jurisdictional minimum, according to proof, including without limitation the $500,000 Deferment payment as alleged above, along with interest at the legal rate.

### FOURTH CLAIM FOR RELIEF

#### (Money Had and Received –

#### Against MRC Defendants and Nolfi)

83.    The Trust realleges and reincorporates all preceding allegations in the Complaint.

84.    The Trust and Nolfi (now effectively the MRC Defendants, based on the reported assignment) entered into the Agreement on or about May 23, 2001. The Agreement was subsequently amended (by letter agreements dated as of November 10, 2004, January 25, 2007, and April 25, 2008).

85.    The MRC Defendants and Nolfi became indebted to the Trust for money had and received by the MRC Defendants and Nolfi for the use and benefit of the Trust in a sum to be proven at trial.

86.    The Trust has made demands for payment from the MRC Defendants and Nolfi.

87.    Full payment of all amounts owed has not been made by the MRC Defendants and Nolfi to the Trust, and there is now owing an amount to be proven at trial, including without limitation the $500,000 Deferment payment as alleged above, with interest at the legal rate.

## FIFTH CLAIM FOR RELIEF
### (Quantum Meruit –
### Against All Defendants)

88.    The Trust realleges and reincorporates all preceding allegations in the Complaint.

89.    The Trust and its various representatives (including the children of Philip K. Dick and Electric Shepherd) performed services as described in the foregoing paragraphs for the Defendants, and those services were all rendered at the request of Defendants.

90.    The fair and reasonable value of those services provided to Defendants will be proven at trial, but are no less than the guaranteed and contingent compensation owed to the Trust under the Agreement.

91.    A partial payment for those services was made, but Defendants have now demanded the return of that payment.  Moreover, Defendants are repudiating any obligation to make any further payments to the Trust.

92.     Defendants have failed and refused, and continues to fail and refuse, t reimburse the Trust for the reasonable value of the services as required by law.

93.     The Trust is entitled to compensatory damages in excess of the jurisdictional minimum, in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### (Unjust Enrichment –

### Against All Defendants)

94.     The Trust realleges and reincorporates all preceding allegations in the Complaint.

95.     At the request of Defendants, the Trust and its various representatives (including the children of Philip K. Dick and Electric Shepherd) provided the benefits and services described in the foregoing paragraphs to Defendants with the expectation, which was fully and clearly understood by Defendants, that there would be reasonable compensation in return for those benefits and services once rendered.

96.     The benefits and services described in the foregoing paragraphs have been rendered to Defendants at the expense of the Trust and its representatives.

97.     It would be unjust for Defendants to retain the benefits of those benefits and services without paying reasonable value therefor.

98.     The Trust is entitled to restitution in an amount equal to the reasonable value of the benefits and services, which is no less than the guaranteed and contingent compensation owed to the Trust under the Agreement.  The amount is in excess of the jurisdictional minimum, and will be proven at trial.

## SEVENTH CLAIM FOR RELIEF

### (Accounting –

### Against MRC Defendants and Nolfi)

99.     The Trust realleges and reincorporates all preceding allegations in the Complaint.

100.   By virtue of the Agreement alleged herein and its entitlement to receive contingent compensation, the Trust is entitled to an accounting from Nolfi (now effectively the MRC Defendants, based on the reported assignment).  The amount of contingent compensation due from Nolfi (now effectively the MRC Defendants, based on the reported assignment) to the Trust is unknown to the Trust and cannot be determined without an accounting.  Nolfi (now effectively the MRC Defendants, based on the reported assignment) is/are in the best position to know the true and correct amount of profits derived from exploitation of "Adjustment Team" because the books and records necessary to make such a determination are in the possession, custody, and control of Nolfi (now effectively the MRC Defendants, based on the reported assignment).

101.   The Trust is informed and believes, and on that basis alleges, that it is entitled to contingent compensation contemplated by the Agreement as alleged herein.

## PRAYER FOR RELIEF

Wherefore, the Trust prays for judgment as follows:

On the First Claim for Relief

1.     For a judicial declaration that at the time of the Agreement "Adjustment Team" was not (and at all times thereafter has not been) in the public domain in the United States or any international territories;

On the Second Claim for Relief

2.     For a judicial declaration that:  (1) the Trust has fulfilled all of its obligations under the Agreement—including that its representations and warranties in the Agreement relating to the copyright in "Adjustment Team" were accurate—and it is entitled to complete performance of Nolfi (now effectively the MRC Defendants, based on the reported assignment) of his/their obligations set forth in the Agreement; (2) the Trust's representations and warranties in the Agreement relating to the copyright in "Adjustment Team" were not material; and (3) even if at

1   the time the Agreement was made (or at any or all times thereafter) "Adjustment

2   Team" was in the public domain in the United States or any international territorie

3   and/or the Trust's representations and warranties in the Agreement relating to the

4   copyright in "Adjustment Team" were not accurate, and/or the Trust did not fulfill

5   some other of its obligations under the Agreement, the Trust would still be entitled

6   to receive full performance by Nolfi (now effectively the MRC Defendants, based

7   on the reported assignment) of his/their obligations set forth in the Agreement;

8          On the Third Claim for Relief

9          3.     For an award of compensatory damages from Nolfi and the MRC

10  Defendants in an amount that is no less than the jurisdictional minimum, according

11  to proof at trial, including without limitation the $500,000 Deferment payment as

12  alleged above;

13         On The Fourth Claim for Relief

14         4.     For an award of monetary damages from Nolfi and the MRC

15  Defendants in an amount that is no less than the jurisdictional minimum, according

16  to proof at trial, including without limitation the $500,000 Deferment payment as

17  alleged above;

18         On the Fifth Claim for Relief

19         5.     For an award of compensatory damages from Defendants in an amount

20  that is no less than the jurisdictional minimum, according to proof at trial;

21         On the Sixth Claim for Relief

22         6.     For restitution from Defendants in an amount that is no less than the

23  jurisdictional minimum, according to proof at trial;

24         On the Seventh Claim for Relief

25         7.     For an accounting under Court supervision to determine the Deferment

26  payments and contingent compensation owed under the Agreement, and the

27  amounts due and payable in accordance with the Agreement;

28

<u>On All Claims for Relief</u>

8.   For the Trust's attorneys' fees and costs of suit incurred herein;

9.   For an award of pre-judgment and post-judgment interest; and

10.   For such other, further or different relief as may be just and proper.

Dated:   October 27, 2011

CARLSMITH BALL LLP

By:

JUSTIN M. GOLDSTEIN
JAY S. HANDLIN
Attorneys for Plaintiff
LAURA ARCHER DICK COELHO,
AS TRUSTEE OF THE PHILIP K.
DICK TESTAMENTARY TRUST

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all claims for relief that may be tried by jury.

Dated:     October 27, 2011

CARLSMITH BALL LLP

By:

JUSTIN M. GOLDSTEIN
JAY S. HANDLIN
Attorneys for Plaintiff
LAURA ARCHER DICK COELHO,
AS TRUSTEE OF THE PHILIP K.
DICK TESTAMENTARY TRUST

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Otis D. Wright II and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

## CV11- 8913 ODW (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[X] Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | **[_] Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | **[_] Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address: Justin M. Goldstein (SBN 198858)
Jay S. Handlin (SBN 196250)
CARLSMITH BALL LLP
444 South Flower Street, 9th Floor
Los Angeles, CA  90071-2901
Telephone:  (213) 955-1200

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA ARCHER DICK COELHO, AS TRUSTEE OF THE PHILIP K. DICK TESTAMENTARY TRUST<br><br>PLAINTIFF(S)<br><br>v.<br><br>MRC II DISTRIBUTION COMPANY L.P., a Delaware limited partnership; MRC II HOLDINGS L.P., a Delaware limited partnership; (cont'd)<br><br>DEFENDANT(S). | **CASE NUMBER**<br><br>CV 11-8913 ODW (JCGx)<br><br><br>**SUMMONS** |

TO:   DEFENDANT(S): MRC II DISTRIBUTION COMPANY, L.P.; MRC II HOLDINGS L.P.; OAKTREE ENTERTAINMENT, INC.; GEORGE NOLFI; MICHAEL HACKETT

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, Justin M. Goldstein _____, whose address is Carlsmith Ball LLP, 444 South Flower Street, 9th Floor, Los Angeles, CA  90071-2901 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated:   OCT 2 7 2011

By: _____
    SHEA BOURGEOIS
    Deputy Clerk

    (Seal of the Court)   SEAL

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

JUSTIN M. GOLDSTEIN  (SBN 198858)
JAY S. HANDLIN  (SBN 196250)
CARLSMITH BALL LLP
444 South Flower Street, 9th Floor
Los Angeles, CA 90071-2901
Telephone:  213.955.1200


# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA ARCHER DICK COELHO, AS TRUSTEE OF THE PHILIP K. DICK TESTAMENTARY TRUST, <br><br> Plaintiff, <br><br> vs. <br><br> **(List of Defendants continued from CV-01A)** <br><br> OAKTREE ENTERTAINMENT, INC., a Delaware corporation; GEORGE NOLFI; and MICHAEL HACKETT, <br><br> Defendants. | Case No. <br><br> SUMMONS (CONTINUED FROM CV-01A) |

TO:    DEFENDANT(S): MRC II DISTRIBUTION COMPANY, L.P., a Delaware limited partnership; MRC II HOLDINGS L.P., a Delaware limited partnership; OAKTREE ENTERTAINMENT, INC., a Delaware corporation; GEORGE NOLFI; and MICHAEL HACKETT

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| | |
|---|---|
| **I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)<br>LAURA ARCHER DICK COELHO, AS TRUSTEE OF THE PHILIP K. DICK TESTAMENTARY TRUST | **DEFENDANTS**<br>MRC II DISTRIBUTION COMPANY, L.P. ; MRC II HOLDINGS L.P. ; OAKTREE ENTERTAINMENT, INC.; GEORGE NOLFI; and MICHAEL HACKETT |
| **(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)<br>CARLSMITH BALL, LLP; 444 S. Flower Street, 9th Floor; Los Angeles, CA  90071-2901; tel. (213) 955-1200 | Attorneys (If Known)<br>Justin M. Goldstein (SBN 198858)<br>Jay S. Handlin (SBN 196250) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No    ☑ **MONEY DEMANDED IN COMPLAINT:** $ 500,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
17 U.S.C. Section 101 et seq.; Declaratory Relief re Copyright Ownership

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | ☑ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | **REAL PROPERTY** | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 220 Foreclosure | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 230 Rent Lease & Ejectment | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 240 Torts to Land | **IMMIGRATION** | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 245 Tort Product Liability | ☐ 462 Naturalization Application | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 290 All Other Real Property | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 245 Tort Product Liability | | ☐ 465 Other Immigration Actions | | |
| | ☐ 290 All Other Real Property | | | | |

**CV11-8913**

**FOR OFFICE USE ONLY:**   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)      CIVIL COVER SHEET      Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☒ No  ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☒ No  ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)    ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Alameda County |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | New York |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
   **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles |  |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR PRO PER):** _____    Date October 27, 2011

   **Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet.  (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program.  (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended.  (42 U.S.C. (g)) |