1 | KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
MICHAEL J. KUMP (SBN 100983)
2 |  mkump@kwikalaw.com
JEREMIAH T. REYNOLDS (SBN 223554)
3 |  jreynolds@kwikalaw.com
808 Wilshire Boulevard, 3rd Floor
4 | Santa Monica, California  90401
Telephone: 310.566.9800
5 | Facsimile: 310.566.9850

6 | Attorneys for Defendants MRC II
Distribution Company, L.P., MRC II
7 | Holdings L.P., Oaktree Entertainment,
Inc., George Nolfi and Michael Hackett

8

9 | UNITED STATES DISTRICT COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 | WESTERN DIVISION

12 | LAURA ARCHER DICK COELHO, | CASE NO. CV 11-8913 ODW (JCGx)
AS TRUSTEE OF THE PHILIP K.
13 | DICK TESTAMENTARY TRUST, | **DECLARATION OF SCOTT TENLEY IN SUPPORT OF MOTIONS TO DISMISS PLAINTIFF'S SECOND THROUGH SEVENTH CLAIMS PURSUANT TO FED. R. CIV. P. 12(B)(1), 12(B)(3) and 12(B)(6)**
14 | Plaintiff,
vs.
15 |
MRC II DISTRIBUTION COMPANY,
16 | L.P., a Delaware limited partnership;
MRC II HOLDINGS L.P., a Delaware
17 | limited partnership; OAKTREE
ENTERTAINMENT, INC., a Delaware
18 | corporation; GEORGE NOLFI; and
MICHAEL HACKETT,
19 |
Defendants.
20 |

Date:       December 19, 2011
Time:       1:30 p.m.
Courtroom: 11

Complaint Filed: October 27, 2011

21
22
23
24
25
26
27
28

Left margin (vertical): KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP · 808 WILSHIRE BOULEVARD, 3RD FLOOR · SANTA MONICA, CALIFORNIA 90401 · TEL 310.566.9800 · FAX 310.566.9850

## DECLARATION OF SCOTT TENLEY

I, Scott Tenley, declare as follows:

1.     I am the Senior Vice President, Head of Business Affairs of MRC II Distribution Company, L.P.  I make this Declaration in support of Defendants' Motions to Dismiss.  I know the following facts of my own personal knowledge and if called as a witness could, and would, competently testify thereto.

2.     Attached hereto as **Exhibit A** is a true and correct copy of the agreement between George Nolfi and The Philip K. Dick Testamentary Trust regarding the acquisition of the "Adjustment Team," dated May 23, 2011.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 18th day of November, 2011, at Los Angeles, California.

SCOTT TENLEY

DECLARATION OF SCOTT TENLEY IN SUPPORT OF MOTIONS TO DISMISS PLAINTIFF'S SECOND THROUGH SEVENTH CLAIMS

**George Nolfi**
c/o Bloom, Hergott, Diemer and Cook, LLP
150 S. Rodeo Drive, Third Floor
Beverly Hills, CA 90212
Attn: Alan Hergott, Esq.

Dated as of May 23, 2001

The Philip K. Dick Testamentary Trust
c/o Scovil Chichak Galen Literary Agency, Inc.
381 Park Avenue south, Suite 1020
New York, NY 10016
Attn: Russell Galen

Re: "Adjustment Team"

Ladies and Gentlemen:

This will confirm the agreement ("Agreement") between George Nolfi ("Purchaser"), on the one hand, and The Philip K. Dick Testamentary Trust ("Owner"), on the other hand, with respect to the published short story entitled "Adjustment Team" written by Philip K. Dick ("Author") (which, together with all now existing and hereafter created titles, plots, themes, ideas, stories, contents, dialogue, characters, artwork, visual images, issues, adaptations and other versions thereof, is hereinafter called the "Property"). The term "Picture" as used herein shall mean the first motion picture produced by Purchaser based on the Property, whether intended for initial television or theatrical release or otherwise.

CONDITIONS PRECEDENT. Purchaser's obligations hereunder shall be contingent upon the occurrence of all of the following events: (a) Owner's execution of this Agreement; (b) Purchaser's approval (in its sole discretion) of the chain of title to the Property, in form and substance satisfactory to Purchaser, and approval of all agreements with respect thereto, and receipt of all assignments and releases deemed necessary by Purchaser in connection therewith; and (c) receipt of an executed Publisher's Release in the form attached hereto as Exhibit "C" (in form and substance acceptable to Purchaser).

1.    Option.

(a)    Initial Option Period: In consideration of the sum of Twenty Five Thousand Dollars ($25,000) ("Initial Option Payment") and other good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, Owner hereby grants to Purchaser the sole, exclusive and irrevocable right and option ("Option") to purchase all right, title and interest, except for those rights reserved to Owner pursuant to paragraph 7 hereof, in all languages, throughout the universe in perpetuity in and to the Property. The Option shall be exercisable at any time commencing on the date hereof and continuing through and including the date which is eighteen (18) months after the later of the date of Owner's execution hereof or satisfaction of the conditions precedent above ("Initial Option Period"). The Initial Option Payment shall apply against the Purchase Price pursuant to paragraph 2(a) below.

(b)    First Extension Period: The period within which the Option may be exercised may be extended for an additional period of twelve (12) months upon written notice accompanied by

241318_3.DOC                              - 1 -                              EXHIBIT A

payment to Owner of an additional sum of Twenty Five Thousand Dollars ($25,000) ("First Extension Payment") on or before the expiration of the Initial Option Period ("First Extension Period"). The First Extension Payment, if any, shall not apply against the Purchase Price pursuant to paragraph 2(a) below.

      (c)    Second Extension Period: The period within which the Option may be exercised may be further extended for an additional period of twelve (12) months upon written notice accompanied by payment to Owner of an additional sum of Twenty Five Thousand Dollars ($25,000) ("Second Extension Payment") on or before the expiration of the First Option Period ("Second Extension Period"). The Second Extension Payment, if any, shall not apply against the Purchase Price pursuant to paragraph 2(a) below.

      The Initial Option Period and the First Extension Period and the Second Extension Period are sometimes referred to herein together as the "Option Period." In the event the Initial Option Period or the First Extension Period or the Second Extension Period would otherwise expire on a Saturday, Sunday or national holiday, said period or extension shall be extended without notice until the end of the next following business day. The Option shall be deemed exercised upon written notice (accompanied by payment of the Purchase Price, as defined below) given to Owner during the Option Period but in no event later than the commencement of principal photography of the Picture.

      (d)    Set-Up Bonus: If during the Initial Option Period, but prior to the exercise, if any, of the Option, Purchaser enters into an agreement for the development and/or production of a motion picture based on the Property with a U.S. motion picture studio (i.e., Fox, Universal, Paramount, Disney, Warner Bros., Columbia or MGM/UA) or a so-called "mini-major studio (e.g., New Line, Miramax) ("Third Party Agreement"), then the additional sum of One Hundred Thousand Dollars ($100,000) ("Set-Up Bonus") shall be payable to Owner within thirty (30) days after full execution of the Third Party Agreement./If Purchaser enters into a Third Party Agreement during either the First Extension Period or the Second Extension Period, the Set-Up Bonus shall be Seventy Five Thousand Dollars ($75,000) in lieu of the amount set forth above. If the Third Party Agreement is with any third party financier, than those set forth above, the Set-Up Bonus shall be Twenty-Five Thousand Dollars ($25,000) in lieu of either of the amounts set forth above. The Set-Up Bonus, if any, shall apply against the Purchase Price pursuant to paragraph 2(a) below.

      (e)    Development Activities: During any and all periods during which the Option is exercisable, Purchaser shall have the right to engage in pre-production activities with respect to a theatrical motion picture or other production intended to be based on the Property, including, without limitation, the preparation and/or submission of treatments, screenplays or other writings based upon the Property and the negotiation and consummation of agreements relating to the rights in the Property which may be acquired by Purchaser hereunder ("Development Materials"). Notwithstanding the foregoing, it is understood and agreed that, whether or not Purchaser exercises the Option, Owner shall have no right, title or interest in or to the Development Materials prepared, created or developed by Purchaser or at Purchaser's request.

      (f)    Suspension and Extension of the Option Period: The Option Period shall be extended without notice for any period during which a third party makes a claim involving the Property until such claim is resolved so that the rights to be granted hereunder can be acquired free and clear of any claims, demands, liens or encumbrances of any kind whatsoever. If any such claim is not resolved within twelve (12) months, Purchaser may, in addition to any additional rights and remedies Purchaser may have at law or in equity, (i) rescind this Agreement by written notice to Owner and, thereupon, Owner shall repay to Purchaser all monies paid hereunder, or (ii) Purchaser may exercise the Option and withhold from any monies payable to Owner hereunder such amount as Purchaser may deem necessary to

cover Owner's potential liability (including, without limitation, costs, expenses and attorneys' fees) on account of such claim. The Option Period shall also be extended without notice for the duration of any event of force majeure (including, without limitation, any riot, war, act of God, strike or labor controversy) affecting the motion picture or television industries or the development and/or production of the Property. No suspension for an event of force majeure shall exceed a period of twelve (12) months from the date of such suspension. Purchaser will notify Owner of any such extension in writing as soon as reasonably practical; provided that Purchaser's failure to do so shall not be deemed a breach of this Agreement.

       (g)    <u>Exercise of the Option</u>: The Option shall be deemed exercised upon written notice (accompanied by payment of the Purchase Price, as defined below) given to Owner during the Option Period but in no event later than the commencement of principal photography of the Picture.

       2.    **Consideration**. As full and complete consideration for all of the rights herein granted and assigned and to be granted and assigned by Owner to Purchaser upon the exercise, if ever, of the Option, and for Owner's representations, warranties and agreements hereunder and provided that Owner is not in breach or default hereof, Purchaser agrees to pay, and Owner agrees to accept, compensation as follows:

       (a)    <u>Purchase Price</u>:

       (i)    If the final overall approved budget of the Picture on the first day of principal photography thereof (exclusive of overhead, contingency, bond fee, deferments, interest and financing costs) ("Budget") is Fifty Million Dollars ($50,000,000) or less, the Purchase Price shall be One Million Dollars ($1,000,000) prior to deduction of the Initial Option Payment and the Set-Up Bonus, if any;

       (ii)    If the Budget is greater than Fifty Million Dollars ($50,000,000) but less than Seventy Five Million Dollars ($75,000,000), the Purchase Price shall be One Million Five Hundred Thousand Dollars ($1,500,000) prior to deduction of the Initial Option Payment and the Set-Up Bonus, if any; or

       (iii)    If the Budget is greater than Seventy Five Million Dollars ($75,000,000), the Purchase Price shall be One Million Eight Hundred Fifty Thousand Dollars ($1,850,000) prior to deduction of the Initial Option Payment and the Set-Up Bonus, if any.

       (iv)    In the event Purchaser exercises the Option prior to setting the Budget, the Purchase Price shall be One Million Dollars ($1,000,000); it being understood that once the Budget has been set, to the extent that Purchase Price exceeds One Million Dollars ($1,000,000) based on the formula set forth above, Purchaser shall pay Owner the difference, if any, between One Million Dollars ($1,000,000) and such Purchase Price within the parameters set forth above, if any.

       (b)    <u>Deferments</u>: If Purchaser exercises the Option and pays Owner the Purchase Price set forth in either 2(a)(i) or 2(a)(ii) above, Owner shall be entitled to the following additional payments (it being understood and agreed that Owner shall not be entitled to any compensation pursuant to this paragraph 2(b) if Owner is paid the Purchase Price set forth in 2(a)(iii) above):
:

       (i)    $100,000 at such time, if ever, as the Picture achieves "Breakeven". As used herein, "Breakeven" shall be defined as the point when worldwide gross receipts, less customary

off-the-top deductions (e.g., trade dues, residuals, costs of currency conversion, etc.), as defined by the production, financing and/or distribution entity (the "P/F/D") with whom Purchaser enters into an agreement (the "P/F/D Agreement"), equals 2 times the cost of production, plus overhead, plus interest, plus the cost of prints and advertising, all as defined by the P/F/D, it being specifically agreed that the foregoing is exclusive of distribution fees and third party participations;

        (ii)    an additional $100,000 for each additional Ten Million Dollars ($10,000,000) in worldwide gross receipts, less customary off-the-top deductions (as set forth in subparagraph 2(b)(i) above, in excess of Breakeven, all as defined by the P/F/D, if ever, until such time, if ever, as Owner has received aggregate total payments of Two Million Dollars ($2,000,000), including the Purchase Price.

        (c)    <u>Net Profits</u>:  If a feature-length theatrical motion picture based upon the Property is produced and released pursuant to the rights granted hereunder, and provided that Owner is not in breach or default hereunder, then Owner shall be entitled to receive an amount equal to two and one-half percent (2.5%) of one hundred percent (100%) of the "net profits", if any, derived from the exploitation of the Picture.  For purposes hereof, "net profits" shall be computed, defined, accounted for and paid as net profits are computed, defined, accounted for and paid pursuant to the provisions of the standard "net profits" definition of the P/F/D with whom Purchaser enters into the P/F/D Agreement with respect to the Picture which shall be subject to changes agreed to after good faith negotiations within the P/F/D's customary parameters.  In the event that Purchaser does not enter into a P/F/D Agreement, Owner's share of "net profits" shall be computed, defined and paid in accordance with Purchaser's standard definition of net profits which shall be subject to changes agreed to after good faith negotiations within Purchaser's customary parameters.  In addition, Owner's definition of "net profits" shall not include overbudget adjustments, cross-collateralization with other pictures or abandonment costs.  Owner acknowledges that Owner's share of net profits, if any, provided hereunder shall not be a lien upon or claim against any of the rights granted herein, the Picture or any other exploitation of the rights granted herein.

       3.    **Representations and Warranties and Indemnifications.**  Owner hereby represents and warrants that:

        (a)    That Owner is the sole owner of all rights (as set forth below) herein granted and has full power and authority to grant said rights to Purchaser; that none of the rights herein granted to Purchaser hereunder have been granted, encumbered, or otherwise disposed of in any manner to any person, firm or other entity; that no motion picture based in whole or in part upon the Property has been produced or authorized by or with the knowledge or consent of Owner; that neither the Property nor any version thereof nor any play or dramatic adaptation based thereon in whole or in part has been published or presented or authorized as a theatrical or nontheatrical motion picture or television production, on stage or on the spoken stage by or with the knowledge or consent of Owner; that Owner has not done or omitted to do and will not do or omit to do any act or thing by license, grant or otherwise, which will or may impair or encumber any of the rights herein granted or interfere with the full enjoyment of said rights; and that there are no claims or litigation pending or threatened which will or might adversely affect any of the rights herein granted to Purchaser; and that no development of the Property or any part thereof (including any idea, treatment or screenplay based thereon) for the purpose of producing a motion picture or other production has been previously undertaken or authorized.  Owner will not execute any other agreement in conflict herewith or in any way attempt to sell, dispose of, encumber or hypothecate any of the rights herein granted to Purchaser with respect to the Property or do or knowingly permit to be done any act or things by which said rights may be impaired; and, Owner agrees that Owner will not use or permit the use of any of the rights in the Property not granted to Purchaser in any manner or for any

purpose which would unfairly compete with the full and unrestricted use of the rights herein granted to Purchaser.

(b)     That the Property was created and written solely by and is wholly original with Author or based on incidental material in the public domain (of which Owner will advise Purchaser); that neither the Property nor any element thereof, or the exercise by Purchaser of the rights herein granted, will violate or infringe upon the trademark, trade name, copyright, patent or violate or infringe upon any other literary, dramatic, musical, artistic, personal, civil or property right or any right of any person and will not violate the rights of privacy or publicity of any person or constitute a defamation against any person.

(c)     The Property is not in the public domain in any jurisdiction of the world and Owner has taken all steps necessary to ensure that the Property is protected under all applicable copyright laws. Owner has and will hereafter perform all of Owner's obligations, if any, in connection with the Property, including without limitation, maintaining the copyright in the Reserved Rights set forth in paragraph 7 below;

(d)     Attached hereto, marked 'Schedule I' and made a part of this Agreement by this reference, is a statement of all publications, if any, prior uses, if any, prior versions, adaptations and translations, if any, and copyright status of the Property.  Such statement shall also set forth the existence, if any, of any valid agreement with third parties for the publication or dramatic production of the Property.  Owner hereby represents and warrants that there is no publisher in existence with any motion picture, television, allied or ancillary rights in and to the Property.

(e)     Owner agrees that Owner will not at any time hereafter issue or cause to be issued any publicity (other than incidental publicity relating primarily to Owner, which publicity shall in no event be derogatory to Purchaser or to the Picture or to any other exploitation of the rights herein granted) regarding this Agreement or the Picture or any other exploitation of the rights herein granted without Purchaser's written consent.

4.     **Indemnification.**

(a)     Owner will defend and indemnify, make good, save and hold harmless Purchaser, and its successors, licensees and assigns from and against any claims, losses, damages, costs, liabilities, charges and expenses (including reasonable, outside attorneys' fees, whether or not litigation is commenced) which may be obtained against, imposed upon or suffered by Purchaser by reason of or arising out of a breach by Owner of the representations, warranties, agreements and authorizations contained herein.

(b)     Except with respect to (i) matters constituting a breach by Owner or any of the representations, warranties, and/or agreements contained herein or (ii) gross negligence, or willful misconduct, or recklessness by Owner, Purchaser will defend and indemnify, and hold harmless Owner from and against any claims, losses, damages, costs, liabilities, charges and expenses (including reasonable, outside attorneys' fees, whether or not litigation is commenced) which may be obtained against, imposed upon or suffered by Owner by reason of or arising out of (i) material added to the Property by Purchaser; and (ii) the development, production and exploitation of the Picture.

5.     **Infringements of Rights.**  Owner hereby grants to Purchaser the free and unrestricted right, but at Purchaser's own cost and expense, to institute in Owner's name and on Owner's behalf, or on

behalf of Purchaser and Owner jointly, any and all suits and proceedings at law or in equity, to enjoin and restrain any infringements of, and to otherwise preserve and protect, the rights herein granted, and Owner hereby assigns and sets over to Purchaser any and all recoveries obtained in any such action. Owner will not compromise, settle or in any manner interfere with such litigation if brought, unless Purchaser so requests of Owner in writing.

6.      **Grant of Rights.**  Upon exercise, if any, of the Option, Purchaser shall solely and exclusively acquire all right, title and interest of any kind or nature whatsoever, whether now or hereafter existing, in all languages, throughout the universe, in perpetuity, except for and subject to the rights reserved by Owner pursuant to paragraph 7 below, in and to the Property and in and to the copyright thereof and all renewals and extensions of copyright.  The foregoing rights include, without limitation, all motion picture and television rights (including, without limitation, filmed, taped or otherwise recorded and CATV rights, all silent, sound, dialogue, musical, live action and animated motion picture and television rights and all remake and sequel rights thereto), audio, audiocassette, videocassette, laserdisc and other compact devices, sequel, prequel, remake, spin off, radio, live television and advertising and promotion rights (including, without limitation, the rights to broadcast and or telecast by television and/or radio or any process analogous thereto, or by any process now known or hereafter devised, any part of the Property or any adaptation or version thereof, and announcements of and concerning such version); digital television, video and computer games, any computer assisted media (including, but not limited to, CD-ROM, CD-I and similar disc systems), interactive media and multimedia and any other devices or methods now known or hereafter devised, all merchandising (e.g., games, toys, apparel, food, beverages, posters, and other commodities, services or items), commercial tie-ins, all domain names, music, music publishing, soundtrack and screenplay publication rights, limited radio broadcasting rights and publication rights not exceeding the greater of 500 words each or 10% of the text, and, without limiting any of the foregoing rights, the following sole and exclusive rights throughout the universe:

(a)      The right to develop, make, produce, adapt, exploit and copyright the Picture and one or more additional motion picture adaptations or versions based in whole or in part on the Property including, but not limited to, remakes of and sequels to any motion picture produced hereunder and motion pictures in series or serial form whether for broadcast on television or otherwise, and for such purposes to record, reproduce and license others to record and reproduce in synchronization with such motion pictures, spoken words taken from or based upon the text or theme of the Property and any and all kinds of music, musical accompaniments and/or lyrics to be performed or sung by the performers in any such motion picture and any and all other kinds of sound and sound effects.  Such motion picture adaptations or versions may be fixed on film, tape, disc, wire, audiovisual cartridge, cassette or by any other technical process now known or hereafter devised in any and all sizes, gauges, colors and types.

(b)      The right to produce sound records in any format or medium now known or hereafter devised of all or any part or the Property and any and all motion pictures or other productions produced hereunder; specifically including the exclusive motion picture synchronization rights in the Property and each and every part thereof; and the exclusive right to use all or any part of the Property upon the parts of instruments servicing to reproduce the same mechanically.

(c)      The right to exhibit, broadcast, transmit, perform, rent, lease and exploit in any manner any motion picture or other production produced hereunder by any and all means and technical processes now known or hereafter devised including, without limitation, film, tape, disc, internet, wire audiovisual cartridge, cassette and all forms of television (including, without limitation, commercially sponsored, sustaining, subscription and pay television) in any place whatsoever, including homes,

241318_3.DOC                              - 6 -

theaters and elsewhere, whether or not a fee is charged directly or indirectly for viewing any such motion pictures, soundrecords or other productions produced hereunder.

(d)     Without limitation of any of the other rights to be granted to Purchaser hereunder, the right to broadcast and/or transmit by means of television, radio or any process analogous thereto now known or hereafter devised, all or any part of the Property or any adaptation or version thereof, and announcements of or concerning said motion picture or other version(s) for the purpose of advertising, publicizing or exploiting such motion picture or other version(s), which broadcasts or transmissions may be accomplished through any method or means (other than through the use of living actors performing simultaneously with such broadcast or transmission) including the use of motion pictures (including trailers) and sound recordings reproduced on film, tape, internet, wire, disc, audiovisual cartridge or otherwise.

(e)     The right to publish and copyright or cause to be published and copyrighted in the name of Purchaser or its nominee in any and all languages throughout the universe, in any form or medium, synopses, scenarios, abridged and/or revised versions of, or excerpts from, the Property and/or fictionalizations (collectively, "Excerpts") not exceeding the greater of 500 words each or 10% of the text, adapted from the Property or from any motion picture or other version of the Property produced hereunder for the purpose of advertising, publicizing and/or exploiting any such motion picture or other version.  Purchaser shall not have the right to sell such Excerpts to the general public.

(f)     The right to publish and exploit screenplays and "making of" books and similar books related to the production of any motion picture produced hereunder. The novelization rights in and to the Property and the Picture shall be frozen and neither Purchaser nor Owner may create or exploit a novelization without the prior written consent of the other.

(g)     The right to use all or any part of the Property and any of the characters, dialogue, plots, themes, stories or ideas therein contained, and the title of the Property and title or subtitle of any component of the Property, as the title of any motion picture or other version of the Property and/or as the title of any musical composition contained in any such motion picture or other version of the Property.

(h)     The right to manufacture, sell, furnish, supply and distribute products, by-products, services, facilities, merchandise, commodities of every nature and description, including, but not limited to, still photography, drawings, posters, artwork, toys, games, items of wearing apparel, foods, beverages, computer software, tapes, phonograph records, soundtrack recordings, sheet music and similar items which make reference to or are based upon or adapted from any motion picture based upon the Property and produced hereunder or any other exploitation of the rights granted herein and the right to make trade deals and commercial tie-ups of all kinds involving or based on any motion picture project or other production produced hereunder, or any part thereof arising out of or connected with the Property, motion picture or other versions thereof, the title or titles thereof, the characters thereof and/or their names or characteristics.

(i)     The right to use Author's name, approved likeness and approved biography (such approvals not to be unreasonably withheld and to be deemed granted if not denied by Owner within five (5) business days following Purchaser's request therefore, unless a shorter period of time is reasonably requested) in and in connection with any motion picture or other production produced hereunder, and the advertising, publicizing and exploitation thereof, and any other use or exploitation of any of the rights to be granted to Purchaser hereunder (provided that Author's name, likeness or biography shall not be used in a manner so as to endorse any product or service).

(j)      The unrestricted right to change, edit, amend, add to, subtract from, use, not use, alter, fictionalize or otherwise modify, and combine with any other material, the whole or any part of, the Property, in any manner Purchaser may in its discretion determine in connection with the Picture or any other exploitation of the rights granted herein.  To the fullest extent allowable under any applicable law, Owner hereby irrevocably waives or assigns to Purchaser Owner's so-called "moral rights" or "droit moral" or any similar laws, and agrees not to institute, support, maintain or authorize any action or lawsuit based in whole or in part on any purported violation of any such law, including, without limitation, any action or lawsuit brought on the ground that any motion pictures or sound records or other work produced hereunder in any way constitute a violation of Owner's moral rights or constitutes a defamation or mutilation of the Property, or any part thereof, or contain unauthorized variations, alterations, modifications, changes or translations of the Property.  Owner expressly acknowledges that many parties will contribute to the Picture and other works that will embody all or part of the Property.  Accordingly, if under any applicable law the above waiver or assignment by Owner of "moral rights" or "droit moral" is not effective, then Owner agrees to exercise such rights in a manner which recognizes the contribution of and will not have an adverse effect upon Purchaser and/or such other parties.  Owner shall not have any right, title or interest whatsoever in or to any plot, subplot, story, character, music, lyrics, dialogue, screenplay or other material of any kind created by or for Purchaser in the exercise of Purchasers rights hereunder, or in any motion pictures produced hereunder or any material created by Purchaser in connection therewith.

(k)      The right, in the name of Purchaser or its designee, to register, renew and extend copyrights, trademarks, patents and otherwise protect the rights granted herein and any or all tangible or intangible material of any kind or nature whatsoever created based upon the rights granted herein.

(l)      The right to use characters from the Property in theme parks and other attractions.

(m)      All rights, licenses, privileges and property to be granted to Purchaser hereunder shall be cumulative and Purchaser may exercise or use or not use any or all of said rights, licenses, privileges and properties together or separately.  If Owner hereafter makes, publishes or permits to be made or published any revision, remake, adaptation, translation, dramatization, new issues or other versions of the Property, Purchaser shall have and Owner hereby grants to Purchaser without payment therefor (except as specifically provided for herein) all of the same rights therein as are herein granted Purchaser with respect to the Property.

(n)      Purchaser, on the one hand, and Owner, on the other, acknowledge and agree that the following sums are in consideration of, and constitute equitable remuneration for, the rental rights included in the Rights:  (i) an agreed allocation to the rental right of 3.8% of the fixed compensation and, if applicable, 3.8% of the contingent compensation provided for in this Agreement; (ii) any sums payable to Owner with respect to the rental right under any applicable collective bargaining or other industry-wide agreement; and (iii) the residuals to Owner under any such collective bargaining or industry-wide agreement with respect to home video exploitation which are reasonably attributable to home video devices for rental purposes in the territories or jurisdictions where the rental right is recognized.  If under the applicable law of any territory or jurisdictions, any additional or different form of compensation is required to satisfy the requirement of equitable remuneration, then it is agreed that the grant to Purchaser of the rental right shall nevertheless be fully effective, and Purchaser shall pay Owner such compensation, or, if necessary, the parties shall in good faith negotiate the amount and nature thereof in accordance with applicable law.

241318_3.DOC                              - 8 -

(o)      Purchaser shall have the exclusive right to all domain names relating to the Property, the Picture and the names of characters and elements contained therein, to the extent that Owner has any control over the assignment of domain names, and excluding domain names associated with Philip K. Dick's overall life and body of work).

7.      **Reserved Rights.**  The following rights are reserved to Owner for Owner's exclusive use and disposition, subject, however, to the provisions of this Agreement:

(a)      Publication Rights:  The publication rights (including Author-Written Sequel rights, as defined below), include (i) the right to publish print editions of the Property, and excerpts from and adaptations of the Property, owned or controlled by Owner, in book form, whether hardcover or softcover and in magazines or other periodicals, whether in installments or otherwise; (ii) the right to publish non-dramatic recorded readings by a single narrator of the text of published print editions of the Property in the form of audiocassettes, audiodisks or similar audio-only devices individually purchased by the end-user; and (iii) the right to publish the text of the published print editions of the Property, and excerpts from and adaptations of the Property, on the internet and in the form of CD-ROM, videocassette tape or similar electronically-read devices individually purchased by the end-user. Such electronically-read editions may contain non-moving visual illustrations which are reproductions of the illustrations contained in the applicable print edition of the Property, but may not contain moving visual illustrations and/or audio tracks of any kind (other than audio tracks as set forth in 7(a)(ii) above).

(b)      Author-Written Sequel:  For the purposes hereof, an "Author-Written Sequel" shall be deemed to be a literary property (story, novel, drama or otherwise), whether written before (Owner represents and warrants that none exist) or after the Property and whether written by Owner or by a successor-in-interest of Owner, using one or more of the characters appearing in the Property, participating in different events from those found in the Property, and whose plot is substantially different from that of the Property. Owner shall have the right to exercise publication rights described in (a) above in any such Author-Written Sequel at any time; provided that Owner may not use new characters or new characterizations or attributes of existing characters, which Purchaser controls or has created for the Picture and which were not contained in the Property. Any other Author-Written Sequel rights (including, without limitation, exclusive motion picture, television and allied rights, etc., of any kind) may not be optioned, assigned, granted or otherwise encumbered and/or disposed of to any third party except as follows: During the Option Period, and, if Purchaser exercises the Option, at anytime thereafter, Purchaser shall have the exclusive first right to negotiate with Owner in good faith, for a period of fifteen (15) days, with respect to such rights in and to such Author-Written Sequel rights. In the event Owner and Purchaser do not enter into a written agreement with respect to the exploitation of such rights, then, Owner agrees not to exercise or authorize any other person to exercise such Author-Written Sequel rights earlier than five (5) years after the first general release in the United States of the Picture, or seven (7) years after the date of the exercise of the Option, whichever is earlier. Thereafter, Owner may contact third parties for the purpose of selling or otherwise disposing of such rights. If Owner shall receive a bona fide offer which Owner desires to accept for acquisition of any of such Author-Written Sequel, Owner shall notify Purchaser in writing of the terms and conditions of the offer. Within thirty (30) business days after Purchaser's receipt of such notice, Purchaser may notify Owner of its acceptance of the terms set forth therein, and in such event the rights referred to in the notice shall be transferred and assigned to Purchaser, subject only to Purchaser's payment to Owner of any cash sums required by the terms of the notice to be paid at that time. Notwithstanding the foregoing, the terms and conditions which Purchaser shall be obligated to accept in order to exercise its right of refusal shall not include terms and conditions which cannot be met as easily by one person as by another, such as the required employment of a particular performer or director. If Purchaser elects not to acquire

the rights specified in said notice, then Owner may dispose thereof, but only to the party named in the notice and only upon the terms and conditions set forth therein, it being understood that Owner shall not dispose of such rights to another third party or on terms less favorable to Owner than those specified in the notice without again complying with the procedures set forth above and Owner shall require that the third party change the lead characters names and some of his/her/third identifying characteristics. In addition, in as much as the characters included in the Property are included in the exclusive rights herein granted to Purchaser, any agreement entered into with a third party pursuant to this paragraph 7(b) with respect to an Author-Written-Sequel shall be for one Picture only and Owner shall not grant any sequel or television series rights to any party other than Purchaser. In addition, rights in not more than one (1) Author-Written Sequel may be disposed of in any two (2) year period. Nothing contained in this paragraph 7(b) shall be deemed a limitation on Purchaser's right to have written sequels, prequels or other subsequent productions, in its sole discretion.

(c)     Live Television: The right to telecast directly from the performance to the audience any adaptation of the Property (provided, however, that such adaptations do not infringe upon any original material included in any motion picture or other version of the Property produced hereunder or any other exploitation of the rights granted herein which is not also contained in the Property), the performance not having been recorded on film, tape, wire or other substance or device whatsoever; subject, however, to Purchaser's right at all times, to televise from living actors, excerpts not to exceed ten (10) minutes in length from and condensations of the Property or any motion picture or other version of the Property produced hereunder for advertising and exploitation purposes and provided nothing herein shall be deemed to nor shall anything contained herein limited Purchaser's unqualified right at all time to telecast Purchaser's motion picture or other version of the Property produced hereunder. The live television rights reserved by Owner do not include the right to authorize or permit the recording, reproduction or later television broadcast of a live performance of the Property; it being understood that any such television broadcast produced or authorized by Owner must be simultaneous with any such reading or performance. Owner agrees not to exercise or authorize any other person to exercise Owner's live television rights earlier than five (5) years after the first general release in the United States of the Picture, or seven (7) years after the date of the exercise of the Option, whichever is earlier. Such restricted period shall also include any license period (plus the 12-month period following expiration of such license period) established pursuant to a license agreement regarding first run television exhibitions in the United States by any U.S. network or by any program delivery service of any television motion picture produced by or in association with Purchaser based on or arising out of the Property. At any time during or after the expiration of the restricted period, Purchaser shall have the exclusive first right to negotiate with respect to said reserved rights, and Purchaser shall have last refusal rights with respect thereto, in accordance with the provisions of subparagraph (f) below.

(d)     Live Dramatic Stage: The right to perform the Property or adaptations thereof on the spoken stage with actors appearing in person in the immediate presence of the audience; provided, however, that no broadcast, telecast, recording, photography or other reproduction of such performance is made; it being understood that any such live dramatic stage performance produced or authorized by Owner must be a "first-class" production, as the terms in known and understood in the legitimate stage business and be with actors performing before a live audience only and not based on any of the literary material developed by Purchaser hereunder. Notwithstanding the foregoing, the live dramatic stage rights reserved to Owner pursuant to this paragraph 7(d) shall not include any rights to any presentation at a theme park or any themed variety show presentation. Owner agrees not to exercise or authorize any other person to exercise Owner's live dramatic stage rights earlier than five (5) years after the first general release in the United States of the Picture, or seven (7) years after the date of the exercise of the Option, whichever is earlier. At any time during or after the expiration of the restricted period, Purchaser

shall have the exclusive first right to negotiate with respect to said reserved rights, and Purchaser shall have last refusal rights with respect thereto, in accordance with the provisions of subparagraph (f) below.

        (e)    Radio:  The right to broadcast the Property by sound (as distinguished from visually) by radio, subject, however, to Purchaser's right at all times to: (i) exercise its radio rights provided in paragraph 6 above for advertising and exploitation purposes by living actors or otherwise, by the use, at any time of up to twenty (20) minutes each time, of excerpts from or condensations of the Property or any motion picture or other version of the Property produced hereunder (not to be serialized), and (ii) in any event to broadcast any motion picture or other version of the Property produced hereunder by radio.  The radio rights reserved to Owner include the right to authorize or permit the recording, reproduction or later broadcast of a live performance of the Property.  Owner agrees not to exercise or authorize any other person to exercise Owner's radio rights earlier than five (5) years after the first general release in the United States of the Picture, or seven (7) years after the date of the exercise of the Option, whichever is earlier.  At any time during or after the expiration of the restricted period, Purchaser shall have the exclusive first right to negotiate with respect to said reserved rights, and Purchaser shall have last refusal rights with respect thereto, in accordance with the provisions of subparagraph (f) below.

        (f)    First Negotiation and Last Refusal Rights:  For the purposes hereof, the "Reserved Rights" shall be deemed to be the live television rights, radio rights, and live dramatic stage rights.  Owner hereby grants to Purchaser the sole, exclusive and irrevocable option to enter into good faith negotiations with Owner with respect to the acquisition of the Reserved Rights as are granted herein with respect to the Property.  Said option shall commence on the date hereof and shall continue until the later of the expiration of the Option or the expiration of the restricted periods set forth above if the Option is exercised.  Purchaser shall exercise the foregoing option by notice to Owner at any time after the date hereof.  Upon such notice, Purchaser and Owner shall negotiate in good faith for a period of thirty (30) days to enter into an agreement whereby Purchaser shall acquire any or all of such Reserved Rights.  If Purchaser and Owner are unable in good faith to enter into such an agreement, or in the event Purchaser elects not to negotiate for such rights, then Owner may negotiate elsewhere for the sale or disposition of said rights, but Purchaser shall have the right to meet the financial terms of any bona fide offer received by Owner, that are equal to or less favorable to owner than the last offer made by Purchaser to Owner with respect thereto.  Owner shall notify Purchaser in writing of the terms and conditions of the offer.  Within thirty (30) business days after Purchaser's receipt of such notice, Purchaser may notify Owner of its acceptance of the terms set forth therein, and in such event the rights referred to in the notice shall be transferred and assigned to Purchaser, subject only to Purchaser's payment to Owner of any cash sums required by the terms of the notice to be paid at that time.  Notwithstanding the foregoing, the terms and conditions which Purchaser shall be obligated to accept in order to exercise its right of refusal shall not include terms and conditions which cannot be met as easily by one person as by another, such as the required employment of a particular performer or director.  If Purchaser elects not to acquire the rights specified in said notice, then Owner may dispose thereof, but only to the party named in the notice and only upon the terms and conditions set forth therein, it being understood that Owner shall not dispose of such rights to another third party or on terms less favorable to Owner than those specified in the notice without again complying with the procedures set forth above.]

        8.    Copyright.  In the event that under any current or future copyright law of any jurisdiction, any of the rights in or to the Property acquired by Purchaser hereunder are subject to a right of reversion or termination (hereinafter the "Reverted Rights"), to the extent and as soon as legally permissible, Owner agrees to accord Purchaser a right of first negotiation and last refusal in connection therewith which shall operate as follows: At such time as such Reverted Rights are subject to reversion, Owner shall negotiate with Purchaser in good faith with respect to Purchaser's acquisition of such rights.

If, following a period of thirty (30) consecutive days Owner and Purchaser are unable to enter into an agreement with respect to Purchaser's acquisition of such Reverted Rights, Owner may thereafter dispose of such Reverted Rights to any other person, subject to the following conditions: Owner shall not, at any time, have the right to dispose of such Reverted Rights at a price or upon terms or conditions less favorable to Owner than those embodied in the last proposal made by Owner to Purchaser during the aforesaid period of negotiation unless Owner first accorded to Purchaser the right to acquire the Reverted Rights from Owner by notifying Purchaser in writing of any bona fide offer which Owner has received and proposes to accept (hereinafter called the "Offer"), specifying in such notice all of the terms and conditions of said Offer, including the person or entities making the Offer. Purchaser shall have the right to acquire such Reverted Rights upon the same terms and conditions as set forth in the Offer, except that terms and conditions which Purchaser shall be obligated to accept in order to exercise such right of first refusal shall not include those terms and conditions specified in the Offer which cannot be met as easily by one person as by another, such as required employment or use of a certain writer, star, or director. If Purchaser shall elect not to acquire such Reverted Rights, then Owner may dispose thereof, but only to the person and at the price and upon the terms and conditions specified in the Offer, it being understood and agreed that Owner may not dispose of such Reverted Rights to any other party or at a price or upon terms and conditions more favorable to such purchaser or assignee than those offered to Purchaser hereunder without again offering the same to Purchaser as provided herein.

9. **Additional Documents.** Owner agrees to execute at Purchaser's request any and all additional documents or instruments, including the short form option agreement attached hereto as Exhibit "A" and the short form assignment attached hereto as Exhibit "B", and to do any and all things reasonably necessary or desirable to effectuate the purposes of this Agreement. In connection therewith, Owner agrees to execute Exhibits "A" and "B" simultaneously with Owner's execution of this Agreement. If such short-form assignment is undated, Purchaser is hereby authorized to date such short-form assignment and to file same in the United States Copyright office immediately upon exercise of the Option. If, within 5 business days from receipt of request therefor, Owner fails to do anything necessary or desirable to effectuate the purposes of this Agreement, including but not limited to renewing copyrights and instituting and maintaining actions for infringements of any rights herein granted Purchaser under copyright or otherwise, Owner hereby irrevocably appoints Purchaser as Owner's attorney-in-fact with the right but not the obligation to do any such things, to execute such documents or instruments, and to renew copyrights and institute and maintain actions in Owner's name and on Owner's behalf but for Purchaser's benefit, which appointment shall be coupled with an interest and shall be irrevocable. Upon receipt of written request from Owner, Purchaser will provide Owner with copies of any documents executed on Owner's behalf.

10. **Credit.** Provided Owner is not in breach or default of its representations, warranties or obligations hereunder and subject to provisions of applicable collective bargaining agreements, if any, and Purchaser's and/or the applicable producer's standard exclusions and exceptions including artwork title exceptions, and further provided that the Picture is substantially based upon the Property, Purchaser agrees to accord credit on any feature-length motion picture as follows:

(a)    On Screen: On all positive prints of the Picture in the main titles thereof (if the screenwriter's credit appears in the main titles, otherwise said credit shall appear in the end titles of the Picture), on a separate card below or after the title in a size of type equal to the size of type accorded the screenwriter of the Picture to read substantially as follows:

(i) If the Picture has the same title as the Property, "Based upon the short story by Philip K. Dick"; or

(ii) If the Picture has a title different than the title of the Property, "Based upon the short story 'Adjustment Team' by Philip K. Dick."

(b)   Paid Ads:  In the billing block portion only (i.e., if there is no billing block then Owner shall not receive credit) of paid ads issued by Purchaser or under Purchaser's direct control (subject to customary exclusions) in which the screenwriter of the Picture is accorded credit. In addition, Owner shall receive credit in so-called "excluded ads", except award, nomination or congratulatory ads naming only the person honored, whenever the screenwriter is accorded credit in such excluded ad.

As used herein, "size" means height, width and thickness.  Except as expressly provided herein, all matters regarding credit, including but not limited to placement, size of type, prominence, etc., shall be determined by Purchaser in its sole and absolute discretion.  Any casual or inadvertent failure of Purchaser, or any failure by a third party, to comply with the provisions of this paragraph shall not be deemed to be a breach of this Agreement.  Upon receipt of Owner's written notice, Purchaser shall use its reasonable efforts to prospectively cure any such failure to accord credit; provided, however, that Purchaser shall have no obligation to change prints or advertising already produced. Purchaser shall use good faith efforts to notify third parties of the foregoing credit obligations; provided that Purchaser's failure to do so shall not be deemed a breach of this Agreement.

11.   No Obligation to Use.  Purchaser is not obligated to produce, distribute or exploit the Picture, or if commenced, to continue the production, distribution, or exploitation of the Picture in any territory.  Regardless of whether or not Purchaser elects to produce, distribute and/or exploit the Picture, Purchaser is not obligated to use in whole or in part the Property acquired by Purchaser hereunder.

12.   Remedies.  With respect to any payment to be made to Owner hereunder, Owner agrees that should for any reason Purchaser fail to make such payment as herein provided, Purchaser shall not be deemed in default hereof unless and until, following such failure, Owner shall give Purchaser written notice demanding such payment and Purchaser shall have failed to make such payment within ten (10) business days after Purchaser's receipt of said notice.  In any event, in the event of any breach or alleged breach of Purchaser's obligations under this Agreement, it is expressly agreed that Owner's sole remedy shall be to seek money damages, not exceeding the amount of payment due hereunder, in a court of competent jurisdiction and Owner hereby waives any right to seek and/or obtain any injunctive or other equitable relief (including, without limitation, rescission) or undertake any legal efforts to restrict the Purchaser's right to exploit the Property and in no event shall Owner have or be deemed to have a lien, charge or other encumbrance upon the rights granted herein or any exploitation thereof.

13.   Payments, Notices and Accountings.  All payments, notices, accountings and other data (collectively, the "Notices") from Purchaser to Owner and Owner to Purchaser shall be sent to the other at the address set forth on the front page of this Agreement or at such other address as Owner and Purchaser may from time to time designate in writing.  Owner hereby irrevocably designates Scovil Chichak Galen Literary Agency, Inc. ("Agent"), 381 Park Avenue South, Suite 1020, New York, NY 10016 (Attention: Russell Galen) as Owner's exclusive agent with respect to the Property (such appointment being coupled with an interest and irrevocable) Owner does hereby irrevocably authorize Purchaser to pay and Purchaser agrees to pay, all monies due or to become due hereunder to and in the name of Agent.  Receipt by said agent shall be deemed receipt by Owner.  All Notices required or desired to be sent, delivered or served hereunder shall be delivered in person to the addressee or deposited in the mails of the United States, postage prepaid, or telexed or deposited in a telegraph office with all charges prepaid or provided for or telecopied.  If any of the Notices are sent by mail of the United States, the

Notices shall be deemed served or made or delivered on the date 3 days after the date of deposit in the mail of the United States or the date of such telex or deposit in a telegraph office or telecopied, as applicable. A copy of all Notices to Purchaser shall be sent to William Morris Agency, 151 El Camino Drive, Beverly Hills, CA 90212, Attn: Alicia Gordon.

14.   **Assignment.**  Purchaser may assign and transfer this Agreement or all or any part of its rights hereunder to any person, firm or corporation, without limitation and Purchaser shall be relieved of its obligations hereunder; provided that unless such assignment is to a "major" or "mini-major" motion picture studio, television network or broadcaster or other financially responsible third party which assumes all obligations in writing, Purchaser shall remain secondarily liable.  Owner may not assign this Agreement or any of its rights hereunder.

15.   **Collective Bargaining Agreement.**  It is understood that this Agreement and Purchaser's obligations hereunder shall not be subject to or rendered in accordance with the provisions of any collective bargaining agreement currently in effect.  In the event that, for any reason, this Agreement shall become subject to any collective bargaining agreement, then to the extent permitted pursuant to such collective bargaining agreement, all payments to Owner hereunder shall be deemed to be in lieu of and credited against any minimum compensation to which Owner is entitled pursuant to said collective bargaining agreement.

16.   **Annotation Guide.**  If and to the extent any material (including, without limitation, characters and characterizations) contained in the Property is based in whole or in part on any actual individual, whether living or dead, or any "real life" incident, Owner shall prepare and deliver to Purchaser, not later than the date of execution of this Agreement, a complete, true and accurate written annotation of such material, in accordance with the guidelines provided in the Annotation Guide attached hereto.  Owner shall also accurately provide such other information as may be reasonably required by Purchaser or its insurance carrier for the purpose of evaluating the risks involved in the utilization and exploitation of the rights herein granted, as well as assist Purchaser in obtaining information and releases to portray from other third parties.

17.   **Theatrical Sequels, Remakes, Television Programs.**  If Purchaser produces and releases the Picture based on the Property, and Owner is not in breach or default hereunder, the following shall apply:

(a)   <u>Theatrical Sequels</u>:  In the event a feature-length theatrical motion picture "sequel" is produced by Purchaser (as the term "sequel" is commonly understood in the entertainment industry), then Owner shall be entitled to receive sums equal to fifty percent (50%) of the Purchase Price paid to Owner pursuant to paragraph 2(a) above, plus, an amount equal to fifty percent (50%) of the percentage of "net profits" to which Owner was paid for the Picture pursuant to paragraph 2(c) above.

(b)   <u>Theatrical Remakes</u>:  In the event a feature-length theatrical motion picture "remake" is produced by Purchaser (as the term "remake" is commonly understood in the entertainment industry), then Owner shall be entitled to receive sums equal to thirty-three and one third percent (33-1/3%) of the Purchase Price paid to Owner pursuant to paragraph 2(a) above, plus, an amount equal to thirty-three and one third percent (33-1/3%) of the percentage of "net profits" to which Owner was paid for the Picture pursuant to paragraph 2(c) above.

(c)   <u>Television Movies and Mini-Series</u>:  In the event a movie-of-the-week and/or mini-series ("Television Production") is produced based on the Picture for U.S. primetime network

television (ABC, CBS, NBC and FBC), then Producer shall pay to Owner the sum of Ten Thousand Hundred Dollars ($10,000) per broadcast hour, but not to exceed the sum of One Hundred Thousand Dollars ($100,000) per Television Production.   For non-primetime or non-network television, the foregoing shall be reduced by fifty percent (50%).

(d)    <u>Television Series</u>:

(i) In the event a television series based upon the Picture ("Series") is produced, Owner shall be entitled to receive the following:

Primetime Network (i.e., ABC, CBS, NBC or FBC)

<u>Running Time</u>:

| | |
|---|---|
| 1-30 minutes | $1,500 |
| 31-60 minutes | $2,000 |
| 61+ minutes | $2,500 |

Non-Primetime or Non-Network

<u>Running Time</u>:

| | |
|---|---|
| 1-30 minutes | $750 |
| 31-60 minutes | $1,000 |
| 61+ minutes | $1,250 |

(ii) If any Series is run for free television in the United States, Owner shall be paid as to the second (2nd) run, the third (3rd) run, the fourth (4th) run, the fifth (5th) and the sixth (6th) run, respectively, twenty percent (20%) of the applicable sum initially paid to Owner as to such Series pursuant to Paragraph 17(d)(i) above within thirty (30) days following broadcast of the applicable episode.  Thereafter, Producer shall have no further obligation to Owner under this paragraph 17(c).

(e)    <u>Payment of Royalties</u>:   Theatrical payments due hereunder shall be payable on the commencement of principal photography of the applicable picture.  Television payments shall be payable upon the initial United States network broadcast; provided, however, that if the applicable production is produced pursuant to an applicable buyer order, but not telecast, then the applicable royalty shall be paid within thirty (30) days after the end of the broadcast season for which it was ordered, provided that Producer has irrevocably received the applicable license fee thereof.

18.    **Insurance.**   Purchaser shall use reasonable efforts to have Owner covered as an additional insured on the third party financier's Errors and Omissions insurance policy for the Picture with respect to claims or liabilities arising out of Purchaser's production, distribution or exploitation of the Picture (and not from a breach by Owner of any representation or warranty under this Agreement); provided that Purchaser's failure to do so shall not be deemed a breach of this Agreement.   The provisions of this paragraph shall not be construed so as to limit or otherwise affect any obligations, representations or agreements by Owner hereunder.

19.   **Videocassette/DVD.**  Provided that Owner is not in breach or default hereof, Owner shall be provided with one (1) one-half inch (½") VHS videocassette and one (1) DVD, if any are made, of the Picture at no cost to Owner upon general availability to the public for Owner's personal use only.

20.   **Premiere.**  Provided Owner is not in breach or default hereof, Owner and one (1) guest shall be invited to attend one (1) major U.S.  celebrity premiere of the Picture.] [Transportation and expenses to such premiere shall be provided in accordance with the customary policies of the third party financier.

21.   **Miscellaneous.**  This Agreement supersedes and replaces all agreements (oral or written) between Owner and Purchaser relating to the Property.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, representatives, assigns and licensees and may not be modified or amended except by a writing signed by both parties.  Paragraph headings in this Agreement are for convenience only and shall not be used in the interpretation or construction of this Agreement.  Purchaser shall be entitled to withhold from any sums due hereunder amounts required to be withheld by any national, state or local government. Nothing contained in this Agreement shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision of this Agreement and any material statute, law, ordinance, order or regulation contrary to which the parties have no legal right to contract, the latter shall prevail, but in such event any provisions of this Agreement so affected shall be curtailed and limited only to the extent necessary to bring it within the legal requirements; provided, however, that no other provision of this Agreement shall be affected thereby and such other provisions shall continue in full force and effect. Nothing herein contained shall constitute a partnership between or joint venture by the parties hereto, or constitute either party the agent of the other.  Neither party shall hold itself out contrary to the terms of this Agreement, and neither party shall become liable for the representation, act or omission of the other contrary to the provisions hereof.  This Agreement is not for the benefit of any third party and shall not be deemed to give any right or  remedy to any third party, whether referred to herein or not.  Neither Purchaser's entering into this Agreement, nor anything herein contained, nor submissions of the Property to Purchaser, shall be construed to be prejudicial to, or operate in derogation of, any rights, licenses, privileges or property which Purchaser may enjoy or be entitled to with respect to the Property and the rights therein as a member of the general public, as though this Agreement were not in existence.  It is

expressly agreed that Purchaser shall not be hereby assuming any of Owner's liabilities or obligations of any kind or nature whatsoever to third parties in connection with the Property. This Agreement shall be interpreted, construed and governed in all respects under the laws of the State of California applicable to agreements executed and intended to be wholly performed within said State and the parties hereby consent to the jurisdiction of the courts of the State of California.

Very truly yours,

_George Nolfi_

George Nolfi

ACCEPTED AND AGREED:

The Philip K. Dick Testamentary Trust

By: _Laura Archer Dick Coelho_

Its: _Trustee_

_7/29/01_

Date of Execution

SCHEDULE I

PREVIOUS PUBLICATIONS

## ANNOTATION GUIDE

Annotated material should contain for each element, whether an event, setting or section of dialogue with in a scene, notes in the margin which provide the following information:

1.      Whether the element presents or portrays:

      (a)      Fact, in which case the note should indicate whether the person's name is real, whether (s)he is alive and whether (s)he has signed a release.

      (b)      Fiction, but a product or inference from fact; or

      (c)      Fiction, not based on fact.

2.      Source material for the element:

      (a)      Book;

      (b)      Newspaper or magazine article;

      (c)      Recorded interview;

      (d)      Trial or deposition transcript;

      (e)      Any other source.

NOTE:      Source material identification should give the name of the source (i.e., New York Times article), page reference (if any) and date. To the extent possible, identify multiple sources for each element. Retain copies of all materials, preferably cross-indexed by reference to script page and scene numbers. Coding may be useful to avoid repeated, lengthy references.

Descriptive annotation notes are helpful (e.g., the setting is a hotel suite because John/Jane Doe usually had business meetings in his hotel suite when visiting Los Angeles - New York Times; April 1, 1981, p.8).

## EXHIBIT "A"

## OPTION AGREEMENT

**KNOW ALL PERSONS BY THESE PRESENTS:** that for good and valuable consideration, receipt of which is hereby acknowledged, the undersigned, The Philip K. Dick Testamentary Trust ("Owner"), hereby grants to George Nolfi ("Purchaser"), and Purchaser's representatives, successors, licensees and assigns, the sole, exclusive and irrevocable right and option to purchase and acquire from Owner the sole and exclusive right, title and interest, including, without limitation, all motion picture, television, and customary allied and incidental rights (to include, without limitation, merchandising, advertising, publicity, music publishing, soundtrack, videocassette rights and limited publication rights) (collectively, "Rights") for production, advertising and exploitation purposes, but subject to certain rights which are expressly reserved by Owner, in all languages, throughout the universe in perpetuity, in and to the below-referenced literary material and any other literary material including, without limitation, all now existing and hereafter created titles, themes, ideas, stories, contents, dialogue, characters, artwork, visual images, issues, adaptations, and other versions thereof and in and to the copyright thereof and all renewals and extensions of such copyright:

| | |
|---|---|
| Title: | "Adjustment Team" |
| Written by: | Philip K. Dick |
| Initial Publisher: | |
| Date and Place of First Publication: | |
| Copyright Registration No.: | |

Owner represents and warrants that Owner is the owner of the Rights, and that Owner has not heretofore sold, assigned, transferred, mortgaged, pledged or hypothecated any of the Rights.

The Option herein granted may be exercised by Purchaser, or its heirs, representatives, successors, licensees or assigns as provided in that certain option/purchase agreement dated as of May 23, 2001 ("Agreement") between Purchaser and Owner, and this Agreement is subject to all of the terms and conditions of the said Agreement, all of which are incorporated herein by reference.

IN WITNESS, WHEREOF, the undersigned has executed this instrument this ___ day of July 2001.

The Philip K. Dick Testamentary Trust

By _____

STATE OF ___CALIFORNIA___ )
                            ) SS
COUNTY OF ___ALAMEDA___ )

On ___JULY 29, 2001___ before me, ___STEPHEN V. WICKERSHAM___, personally appeared ___LAURA ARCHER DICK COELHO___, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.          (SEAL)

_____
Notary's Signature

STEPHEN V. WICKERSHAM
COMM. # 1292177
NOTARY PUBLIC-CALIFORNIA
ALAMEDA COUNTY
COMM. EXP. FEB. 6, 2005

EXHIBIT "B"

ASSIGNMENT

KNOW ALL PERSONS BY THESE PRESENTS: that for good and valuable consideration, receipt of which is hereby acknowledged, the undersigned, The Philip K. Dick Testamentary Trust ("Owner"), hereby grants, sells, assigns and sets over to George Nolfi ("Purchaser"), and Purchaser's representatives, successors, and assigns, as of _____, _____ the sole and exclusive right, title and interest, including, without limitation, all motion picture, television and certain allied and incidental rights (to include, without limitation, merchandising, advertising, publicity, music publishing, soundtrack, videocassette rights and limited publication rights) (collectively, "Rights") for production, advertising and exploitation purposes, but subject to certain rights which are expressly reserved by Owner, in all languages throughout the universe, in perpetuity, in and to the below-referenced literary material and any other literary material, including, without limitation, all now existing and hereafter created titles, themes, ideas, stories, contents, dialogue, characters, artwork, visual images, issues, adaptations, and other versions thereof, and in and to the copyright thereof and of any productions produced by Purchaser which are based thereon or derived therefrom and all renewals and extensions of such copyright(s):

|  |  |
|---|---|
| Title: | "Adjustment Team" |
| Written by: | Philip K. Dick |
| Initial Publisher: | _____ |
| Date and Place of | |
| First Publication: | _____ |
| Copyright Registration No.: | _____ |

Owner and Purchaser have entered into or are entering into a formal option/purchase agreement dated as of May 23, 2001 ("Agreement") relating to the transfer and assignment of the rights in and to said literary work, which rights are more fully described in the Agreement, and this assignment is expressly made subject to all of the terms, conditions and provisions contained in the Agreement, all of which are incorporated herein by reference.

IN WITNESS WHEREOF, the undersigned has executed this assignment this 8 9th day of July 2001.

The Philip K. Dick Testamentary Trust

By: _Lauren Archer Dick Coelho_

STATE OF _____CALIFORNIA_____ )
                                ) SS
COUNTY OF _____ALAMEDA_____ )

On _____JULY 29, 2001_____ before me, _____STEPHEN V. WICKERSHAM_____, personally appeared _____LAURA ARCHER DICK COELHO_____, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.                (SEAL)

_____
Notary's Signature

STEPHEN V. WICKERSHAM
COMM. # 1292177
NOTARY PUBLIC-CALIFORNIA
ALAMEDA COUNTY
COMM. EXP. FEB. 6, 2005

241318_3.DOC                        - 21 -